# Carl Benit Cooper

### -vs-

# Department of Justice

**The following attachments are included in Mr. Cooper' <u>pro-se</u> Bivens Complaint pursuant to 42 USC 1983:**

## I. <u>Exhibit Numbers 1-5:</u>

**Exhibit #1.** Addendum to PSR coversheet dated, August 2, 1996 (1 page)

**Exhibit #2.** Bureau of Prisons' notice of release dated, September 20, 2005 (1 page)

**Exhibit #3.** Attachment-B Affidavit of Special Agent V.O. Little dated, November 4, 1994 (1 page)

**Exhibit #4.** Paul G. Helms, Private Investigator Summary Report dated, February 22, 1995 (4 pages)

**Exhibit #5.** Original Indictment dated, January 11, 1995 (1 page)

## II. <u>Grand Jury (GJ) Presentation dated, January 11, 1995:</u>

pp. 1-7      p. 12      p.p. 19-21      pp. 24-26      pp. 35-37

## III. <u>PreSentence Report (PSR) dated, March 5, 1996:</u>

(Pages 1-21)

## V. <u>Trial Transcripts (Tr.) dated, September 11-22, 1995:</u>

| | | | | | | |
|---|---|---|---|---|---|---|
| p. 86 | p. 301 | p. 469 | p. 576 | p. 827 | p. 866 | p. 1170 |
| p. 182 | p. 352 | p. 471 | p. 611 | p. 828 | p. 867 | p. 1171 |
| p. 183 | p. 353 | p. 538 | p. 612 | p. 834 | p. 1050 | p. 1203 |
| p. 271 | p. 357 | p. 543 | p. 613 | p. 856 | p. 1051 | |
| p. 281 | p. 456 | p. 546 | p. 801 | p. 860 | p. 1052 | |
| p. 299 | p. 468 | p. 573 | p. 802 | p. 861 | p. 1163 | |

UNITED STATES DISTRICT COURT
FEDERAL PROBATION SYSTEM

TRANSMITTAL OF PRESENTENCE REPORTS
TO INSTITUTION

**ADDRESS OF PROBATION OFFICE**

P. O. Box 894
83 Broad Street
Charleston, SC 29402

Date 7-31-9

Community Corrections Manager
U.S. Bureau of Prisons
505 McDonough Boulevard, SE
Atlanta, GA 30315

AUG - 2

Attached are copies of the presentence report/probation violation report and a copy of the Judgment in a Criminal Case Order made in the case of:

Cooper, Carl Benit

2:95-206

THE FOLLOWING RESTRICTIONS ARE BY ORDER OF THE COURT FILED FEBRUARY 24, 1991.

1. This presentence report is a confidential Court document.

2. The Court preserves the confidentiality of the copy of this presentence report.

3. This copy is loaned for the purpose of the Bureau or Commission to serve their statutor functions.

4. The inmate may be allowed to read this copy of the presentence report at the appropriate time BUT IS NOT TO BE GIVEN A COPY OF THE REPORT OR ALLOWED TO COPY THI: REPORT.

5. This copy must be returned to the Court after it has served its functions with the Commissio or Bureau.

J. Scott Youngblood
U.S. Probation Officer

**FILED**

Exhibit #1

MAY 2 2 2006

06 0961

BP-S714.056  **NOTICE OF RELEASE AND ARRIVAL**  CDFRM
APR 03
**U.S. DEPARTMENT OF JUSTICE**                    **FEDERAL BUREAU OF PRISONS**

| Inmate Name<br><br>COOPER, CARL BENIT | Reg No.: <u>91121-071</u><br>FBI No.: <u>757204WA7</u><br>(Misc No.) | Institution/Address<br>Federal Bureau of Prisons<br>Community Corrections Office<br>P. O. BOX 725<br>Creedmoor, NC 27522 |
|---|---|---|

| Release Date: 09-20-2005 | Release Method: GCT REL |
|---|---|

| Public Law Days<br><br>0 | Supervision to follow release: (if yes, advise inmate of Obligation to Report for Supervision)<br>    <u>X</u> YES (<u>5</u> years___ months)<br>    ___ NO |
|---|---|

**RELEASED TO: (Check one)**

| ___ Community<br><br>Transportation arranged to:_____<br>                             (City and State)<br>Method of transportation:_____<br>                    (Name of common carrier or other)<br>Date of expected arrival at residence:_____ | ___ Detainer<br><br>Detaining Agency:_____<br><br>Agency Address:_____<br>_____ |
|---|---|

**SUPERVISION JURISDICTION(s)**

| Sentencing District<br>John R. Long, Chief USPO<br>U.S. Probation Office<br>Eastern District of Virginia<br>401 Courthouse Square<br>Alexandria, Virginia 22314 | District of Residence (Relocation) |
|---|---|

Address of proposed residence: <u>146 Dozier Rd. Moysek, N.C.</u>

**DNA STATUS**

| DNA sample required:<br>___ YES    ___ NO | If YES date sample taken | DNA Number |
|---|---|---|

**Obligation to Report for Supervision:** If you were sentenced to, or otherwise required to serve, a term of supervision, this term begins immediately upon your discharge from imprisonment, and you are directed to report for supervision within 72 hours. If you are released from a detaining authority, you shall report for supervision within 72 hours after your release by the detaining authority. If you can not report for supervision in the district of your approved residence within 72 hours, you must report to the nearest U.S. Probation Office for instruction. Failure to obey the reporting requirements described above will constitute a violation of release conditions.

| Inmate's Signature (file copy only)<br><br>_Carl B. Cooper_ |
|---|

Distribution:    Inmate Central File (Section 5), Inmate, Chief Supervision Officer in Sentencing District, Chief Supervision Officer in District of Residence, and U.S. Parole Commission (if applicable)

(This form may be replicated via WP)    This form replaces BP-S714 dated FEB 02

**FILED**

MAY 2 2 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## Exhibit #2

06 0961

ATTACHMENT B

AFFIDAVIT

Personally appeared before me, V. O. Little, a Special
Agent of the Federal Bureau of Investigation, and states as
follows:

On October 11, 1994, Carl Cooper and Nathan Williams
advised that at approximately 9:32 p.m., while working as
Pinkerton Security Guards, they were robbed while attempting to
repair a malfunctioning Nationsbank Automated Teller Machine
located at 1020 Anna Knapp Boulevard, Mt. Pleasant, South
Carolina (SC), which is insured by the Federal Deposit Insurance
Corporation, an agency of the United States Government.  The
Pinkerton Security Guards were contracted by Nationsbank to
repair the automated teller machine.  Cooper and Williams opened
the automated teller machine and began to repair the malfunction
when two masked men ran from behind the side of the bank
building.  Subject #1, armed with a pistol, shouted at the guards
"Don't try anything"  as he ran toward them.  Subject #2
approached Williams from the rear and removed Williams' service
revolver.  Subject #2 then took Williams to the far side of the
van where he held him at gun point.  Cooper was armed but his
revolver was not on his person; it was lying on top of the
automated teller machine.  Subject #1 ordered Cooper to remove
the canisters, containing the money, from the machine and placed
them in the back of the Pinkerton Security Van.  Subject #1
shouted at Cooper several times to "hurry up motherfucker".

06 0961

FILED

MAY 2 2 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Exhibit #3

*H & M Associates of Charleston, Inc.*

*Investigations and Polygraph Service*

Associates:
John L. Moody
Paul G. Helms

P.O. Box 40640
North Charleston, SC 29423

Phone: (803) 767-2418
Fax: (803) 760-2092

February 22, 1995

To:    Andrew J. Savage, III, Esquire
       15 Prioleau Street
       Charleston, S. C.   29401

Subj:  Carl A. Cooper, Summary of Investigation

On December 14, 1994, this agency was employed by Andrew J.
Savage, Esquire, concerning the charge of Bank Robbery and
Conspiracy on one Carl A. Cooper. The charges were lodged
against Cooper by the F.B.I. that involved some thefts from,
Nations Bank ATM machines, over a period of time during the
summer and up to his arrest in 1994.

1.    On December 15, 1994, investigator Helms met with an
interviewed Carl Cooper at 15 Prioleau Street Charleston, S. C.
The interview and subsequent meeting with the U. S. Attorney
lasted some six and one half hours. During that interview Cooper
denied andy involvement in monies missing from Nations Bank ATM's
or that he was now or ever involved in a conspiracy to steal
monies from Nations Bank.

2.    On December 16, 1994, investigator Helms interviewed Cooper's
wife.  That interview was structured around a previous interview
between her and the FBI on or about November 23, 1994 at her
place of employment.

3.    On December 21, 1994, investigator Helms contacted Jerry
Williams at Pinkerton's, he was the supervisor of Carl Cooper
when he worked there. Mr. Williams told me that he wanted to
talk with his supervisor before he would agree to let me talk
with Pinkerton employee's.

4.    On December 22, 1994, investigator Helms contacted Mr.
Williams with Pinkerton about a decision to talk to the employees
of Pinkerton.  No decision had been reached at that time.
Investigator Helms attempted to contact Agent Little of the FBI
on this date.

5.    On December 23, 1994, investigator Helms contacted Mr.
Williams with Pinkerton. There was still no decision about being
able to speak with Pinkerton employees, at that time.

On December 23, 1994, investigator Helms called and left a
message for Agent Little with his office regarding the Carl
Cooper case.

**Exhibit #4**

06 0961

**FILED**

MAY 2 2 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

page 2

6. On December 26, 1994, investigator Helms attempted to contact Mr. Williams of Pinkerton's and Agent Little with the FBI, neither of them were in their offices at that time.

7. On December 27, 1994, investigator Helms contacted Mr. Williams with Pinkerton. Mr. Williams stated that the position of Pinkerton was that they didn't want their employees to speak with me or anyone else about Carl Cooper. Mr. Williams provided me with the name of Geneva Browning in the Pinkerton Atlanta Headquarters Office. Later during the day I spoke with Mrs. Browning, who repeated the earlier conversation, that I had with Mr. Williams.

On December 27, 1994, investigator Helms attempted to contact Agent Little of the FBI. His office informed me that he would be out of the office until January 3, 1995.

8. On January 3, 1995, investigator Helms spoke with Agent Little. Agent Little informed me that Cooper's case was going to the Grand Jury January 10 or 11, 1995, and he expected Cooper to be indicted at that time. He wouldn't share any of the case information with me, he stated we could get it through discovery after the indictment. He did tell me that he had interviewed some 20 to 30 people during the course of his investigation and the majority of them were Pinkerton employees.

On January 3, 1994, investigator Helms started to contact past and present employees of Pinkerton after speaking with Cooper. Contacted were Coleen Bourque, a past employee, and Ken Youiginer a present employee with Pinkerton's and established appointment for interviews with both of them.

Mrs. Bourque didn't keep that appointment nor did she keep subsequent appointments regarding Carl Cooper. Mr. Youiginer's wife called on the date of the appointment. She stated that Ken was afraid to meet with me out of fear of loosing his job with Pinkerton.

9. On January 4, 1995, investigator Helms spoke with G. Browning and Diane Good with Pinkerton's Headquarters in Atlanta, trying to muscle my way into talking with Pinkerton employee's. The tactic didn't work and they refused to allow me to talk with their employee's.

On January 4, 1995, investigator Helms spoke with James Washington, a current employee with Pinkerton. He stated that he would love to speak with me but he was afraid he would loose his job if he did.

page 3

10.    On January  11, 1995, investigator Helms  met with and tape recorded an interview with a past employee of Pinkerton, a Donald Dunlap.  A  copy of this  interview was faxed  to your office  on January 12, 1995.  During the interview Dunlap stated his brother Ronald,  who still  worked at  Pinkerton's, had  told him  he was afraid he would loose his job if he spoke with anyone besides the FBI and Pinkerton personnel about Carl Cooper.

11.    On  February 2, 1995, investigator Helms  conducted a telephonic interview  with Sylvester D. Fryson.  Mr.  Fryson can testify  to 'Carl Cooper's character and to Cooper winning several thousands of dollars at a Florida dog track during 1994.

12.    On  February  6,  1995, investigator Helms  conducted a telephonic interview  with Michael Reese.  Mr.  Reese can testify to  Carl  Cooper's  character  and to Cooper winning  several thousands of dollars from the Georgia Lottery during 1994.

Also,  on  February  6,  1995, investigator Helms  conducted a telephonic  interview with Karl  Fields.  Mr.  Fields is Cooper's father-in-law.  Fields  can testify to Cooper's character, and he believes,  that Cooper won over $5,000.00 from the Georgia Lottery during 1994.

13.    On  February  7,  1995, investigator Helms  conducted a telephonic interview  with Peter Shanks.  Shanks can  testify to Cooper's  character  and to  Cooper winning  some money  from the Georgia  Lottery  during 1994.  Shanks; also,  loaned Cooper $3,000.00 in 1994 for use in the construction of Cooper's home at 906 N. Palmetto in Summerville, S. C.

On February  7, 1995,  investigator Helms conducted  a telephonic interview with  Bobby Trappier.  Trappier can  testify to loaning Carl Cooper some money and to Cooper's character.

14.  On February  18, 1995, investigator Helms conducted  a taped interview with  a Mr.  William Weber.  Weber is  a neighbor  of Cooper's and he can  testify to Cooper's character over  the past year only.

15.  On February  20, 1995, investigator Helms conducted  a taped interview with Ed Tinsley.  Tinsley is a neighbor of Cooper's and he can  testify to  Cooper's character  for the  last year and  a half.

This  concludes our  investigative efforts  into the  Carl Cooper case as  of February 22, 1995.  We hope the  information will be useful in your defensive efforts of Cooper.

page 4


We  thank you for using H & M Associates, if we can be of further
assistance with Carl Cooper or any matter please call.

Sincerely,

Paul G. Helms

Encl:  (8)

CONSECUTIVE TO ALL OTHER COUNTS

MAXIMUM SENTENCE THIS COUNT

FINE OF $ 250,000 (18 USC 3571)

AND/OR IMPRISONMENT FOR 15 YR(S)

AND A TERM OF SUPERVISED RELEASE OF

3 YR(S) (18 USC 3583)

SPECIAL ASSESSMENT $ 50.00

(18 USC 3013)

## COUNT 4

THE GRAND JURY FURTHER CHARGES:

On or about October 11, 1994, in the District of South Carolina, the defendants, **CARL BENIT COOPER AND WILFRED RIVERS**, during and in relation to the commission of an armed robbery, a crime of violence, which is prosecutable in a court of the United States, willfully did use and carry a firearm;

In violation of Title 18, United States Code, Sections 924(c) and (2).

A _____ True _____ BILL

**S/ROBERT C. MOMEIER**

FOREMAN

J. PRESTON STROM, JR. (APS\BHH)
UNITED STATES ATTORNEY

06 0961

Exhibit #5

FILED

MAY 2 2 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

1

PRESENTATION OF INDICTMENT

GRAND JURY #2

WEDNESDAY, JANUARY 11, 1995


CASE:          United States vs. Carl Benit Cooper and

               Wilfred Rivers

ATTORNEY:      Brucie H. Hendricks, AUSAS

WITNESS:       V.O. Little, VCTF


BY MS. HENDRICKS:

    We have a quorum; is that correct?

BY THE FOREMAN:

    We do have a quorum.

BY MS. HENDRICKS:

    The case that we're going to present this morning is

    entitled United States of America versus Carl Benit

    Cooper and Wilfred Rivers.

    What I'm going to do first is read over the indict-

    ment to you and the statute, and then I'm going to

    bring the case agent in to return some subpoenas

    that have been issued in this case, some bank sub-

    poenas, and then I will let him present the facts

    for the indictment.

    I'm going to go ahead and read the indictment.  As

    I said, it's United States versus Carl Benit Cooper

2

1    and Wilfred Rivers.  It's kind of a long indictment,

2    so bear with me.

3    Count 1, "The Grand Jury charges from in or about

4    July, 1994, through in or about November, 1994, in

5    the District of South Carolina, the Defendants, Carl

6    Benit Cooper and Wilfred Rivers, and others known

7    and unknown to the Grand Jury, did knowingly and

8    wilfully combine, conspire, confederate and agree

9    with each other to commit the following offenses

10    against the United States:

11    (1)  Taking and carrying property in the care and

12    custody of the bank, in violation of Title 18, Unit-

13    ed States Code, Section 2013(b).

14    (2)  Armed bank robbery, in violation of Title 18,

15    United States Code, Section 2013(a) and (b), and

16    (3)  Using and carrying firearms during and in rela-

17    tion to a crime of violence, in violation of Title

18    18, United States Code, Section 1024(c).

19    At all times, relevant to this indictment:

20    (a)  NationsBank was a federally insured financial

21    institution with its corporate headquarters located

22    in Charlotte, North Carolina and with branch offices

23    located in South Carolina.

24    (b)  NationsBank operated automated teller machines,

25    hereinafter referred to "ATM", at several of its

*[Handwritten annotation in right margin: Rivers testified that he did not take with me during July / August of 1994 which is false.]*

3

1   branch offices located in Charleston, South Caroli-

2   na.

3   "Automated," for the benefit of the court reporter,

4   is a--u-t-o-m-a-t-e-d.  Rather than "automatic" it's

5   "automated."

6   An ATM provides twenty-four-hour banking services to

7   customers who present ATM-designated cards and ac-

8   cess codes, and is supplied with thousands of dol-

9   - lars in United States currency and dispenses United

10  States currency in denominations of $20 and $5 to

11  bank customers who possess valid ATM cards and ATM

12  access codes.

13  (c)  NationsBank contacted the Pickerton Security

14  and Investigation Services, hereinafter referred to

15  as "Pickerton," to respond to ATM's malfunction and

16  security alarms.

17  (d)  Carl Benit Cooper, hereinafter referred to as

18  "Cooper," was employed by Pickerton to respond to

19  ATM malfunctions and security alarms.

20  (e)  Wilfred Rivers, hereinafter referred to as

21  "Rivers," lived in the same neighborhood as Cooper

22  in Summerville, South Carolina.

23  Overt Acts:  In furtherance of the conspiracy, and

24  to effect the object thereof, Carl Benit Cooper and

25  Wilfred Rivers and others unknown to the Grand Jury,

4

1   did commit among other things in the District of
2   South Carolina the following overt acts:
3   (1)  Sometime in 1994, the exact date being unknown,
4   Rivers met Cooper at Cooper's residence, located at
5   902 North Palmetto Street, Summerville, South Caro-
6   lina.
7   (2)  On or about July the 6th, 1994, Cooper and
8   others unknown to the Grand Jury entered the ATM
9   NationsBank from the Festival Center located at 5101
10  Ashley Phosphate Road, North Charleston, South Caro-
11  lina, and stole approximately $9,000.
12  (3)  In July, 1994, Cooper admitted to Rivers that
13  he had stole money from ATM's.
14  (4)  Sometime between July and August of 1994 Cooper
15  showed Rivers a fire-restraint box located under
16  Cooper's residence in Summerville, South Carolina,
17  containing approximately $30,000 in currency.
18  (5)  On September 21st, 1994, Rivers approached the
19  ATM NationsBank located at 5101 Ashley Phosphate
20  Road, North Charleston, South Carolina, and inserted
21  an ATM card in an attempt to cause the ATM to mal-
22  function.
23  (6)  Sometime before September 21st, 1994, Cooper
24  obtained from a Pickerton employee a key to enter
25  the ATM NationsBank located at Festival Center, 5101

5

1    Ashley Phosphate Road, North Charleston, South Caro-

2    lina.

3    (7)   Between September 23rd and September 24th,

4    1994, Cooper and Rivers stole approximately $40,000

5    from the ATM NationsBank, Festival Center, located

6    at 5101 Ashley Phosphate Road, North Charleston,

7    South Carolina.

8    (8)   On September 24th, 1994, Rivers concealed at

9    his residence a bag containing the $40,000 stolen by

10   Cooper and Rivers from the ATM NationsBank, Festival

11   Center, located at 5101 Ashley Phosphate Road, North

12   Charleston, South Carolina.

13   (9)   Sometime after September the 24th, 1994, Cooper

14   gave $10,000 of the $40,000 stolen from the ATM

15   NationsBank, Festival Center, 5101 Ashley Phosphate

16   Road, North Charleston, to the Pickerton employee,

17   who gave Cooper the key to enter unlawfully the ATM.

18   (10)   Sometime after September 24th, 1994, Cooper

19   traveled to the state of Georgia to exchange the

20   denominations of the money stolen from the ATM.

21   (11)   On or about October the 3rd, 1994, Cooper

22   purchased a satellite system for $2,834.75, utiliz-

23   ing the proceeds stolen from an ATM.

24   (12)   Sometime prior to October the 11th, 1994,

25   Cooper and Rivers agreed to stage a robbery of an

6

ATM, with Rivers and another individual approaching

an ATM that was being serviced by Cooper.

(13)  On October the 11th, 1994, at approximately

8:41 p.m., Rivers approached the ATM NationsBank,

located at 1020 Anapp Boulevard, Mount Pleasant,

South Carolina, in a Ford automobile, and inserted

an ATM card into the ATM and departs;

(14)  On October the 11th, 1994, at approximately

8:49 p.m., Rivers again approached the ATM located

at NationsBank, 1020 Anapp Boulevard, Mount Pleas-

ant, South Carolina, in a Ford automobile.

(15)  On October the 11th, 1994, at approximately

9:18 p.m., Cooper and Rivers approached the ATM

NationsBank located at 1020 Anapp Boulevard, Mount

Pleasant, South Carolina, in separate vehicles.

(16)  On October the 11th, 1994, between 9:18 p.m.

and 9:32 p.m., Cooper and Nathan Williams, a

Pickerton employee with no knowledge of the staged

robbery, attempted to correct the malfunction at the

ATM NationsBank, located at 1020 Anapp Boulevard,

Mount Pleasant, South Carolina.

(17)  On October the 11th, 1994, at approximately

9:33 p.m., Rivers approached Cooper and Nathan Wil-

liams with a gun pointed at them.  Cooper emptied

the ATM and gave $47,100 to Rivers.

7

1      (18)  On October the 11th, 1994, Cooper, Rivers and

2      another individual unknown to the Grand Jury, stole

3      approximately $47,100 in the presence of Nathan

4      Williams from the ATM NationsBank, located at 1020

5      Anapp Boulevard, Mount Pleasant, South Carolina,

6      while using and carrying a handgun.

7      (19)  On October the 11th, 1994, <u>Cooper provided</u>

8      <u>false information to law enforcement</u> officials in-

9      vestigating the robbery of the ATM NationsBank lo-

10     cated at 1020 Anapp Boulevard, Mount Pleasant, South

11     Carolina.

12     (20)  Sometime after October the 11th, 1994, Cooper

13     and Rivers divided the proceeds from the robbery at

14     the ATM NationsBank located at 1020 Anapp Boulevard,

15     Mount Pleasant, South Carolina.

16     (21)  On or about October the 27th, 1994, Rivers

17     purchased building materials with the proceeds of

18     the robbery of the ATM NationsBank located at 1020

19     Anapp Boulevard, Mount Pleasant, South Carolina, all

20     in violation of Title 18, United States Code, Sec-

21     tion 371."

22     Madame court reporter, I missed a typographical

23     error in number 21, over act number 21, and I'm

24     going to, after I finish reading the indictment, ask

25     the Grand Jury technician exactly what she wants me

19

1       proposed indictment?

2   A.   Yes.  It started approximately June or July of 1994.

3        Cooper and Rivers both had talked about possibly

4        doing a -- they would call it a staged robbery,

5        where Cooper would go to the machine, as he would

6        do, or receive a normal service call, and attempt to

7        perform the malfunction, at which time Rivers would

8        come along and rob him of the money.

9   Q.   Okay.  Did they ever have occasion to meet at

10       Cooper's residence at 906 North Palmetto Street in

11       Summerville, South Carolina?

12  A.   Yes.  They met several times at his residence to

13       discuss the robbery.

14  Q.   And around July the 6th, 1994, do you have any evi-

15       dence that Cooper and others unknown to the Grand

16       Jury entered the ATM NationsBank at Festival Center,

17       located at 5101 Ashley Phosphate Road in North

18       Charleston?

19  A.   Yes.  Rivers had provided information that Cooper

20       had stolen $7,000 from an ATM machine located near

21       that location.

22  Q.   And were you able to confirm whether or not that

23       occurred?

24  A.   Yes.  NationsBank records reflect that there was

25       $7,000 taken from the ATM machine around the weekend

20

1   of July the 4th to July the 7th.

2   Q.   Has the investigation revealed anything else in

3        terms of that particular loss to the bank?

4   A.   No.

5   Q.   All right.  Do you have any evidence as to whether

6        or not in July, 1994, Cooper admitted to Rivers that

7        he had stolen money from ATM's?

8   A.   Yes.  On several occasions Cooper showed Rivers

9        large sums of money, most notably twenty-dollar

10       bills and five-dollar bills strapped together as if

11       they were crisp new bills.  At his residence he

12       showed it to him, large sums of money.

13  Q.   And is this information is based on interviews that

14       you've conducted, along with officers, of Mr.

15       Wilfred Rivers?

16  A.   Yes, it is.

17  Q.   And do you have any evidence as to whether or not

18       between July and August, 1994, Cooper showed Rivers

19       a fire-restraint box located under Cooper's resi-

20       dence in Summerville?

21  A.   Also Rivers provided us with information that he had

22       in fact seen a fire-restraint box containing twenty-

23       and five-dollar bills with the straps, the bank

24       straps still on them, comprised of new twenty- and

25       five-dollar bills.

21

Q.   And do you have an approximate figure as to how much
     money was in that fire-restraint box?

A.   Rivers advised that Cooper had somewhere in the
     neighborhood of $30,000.

Q.   And has your investigation revealed whether or not
     on September the 21st, 1994, Rivers approached the
     ATM located at 5101 Ashley Phosphate Road, North
     Charleston at the NationsBank and inserted an ATM
     card in an attempt to cause that ATM to malfunction?

A.   Yes.  We've been able to, through bank surveillance
     tapes, identify Rivers inserting his ATM card into
     the ATM machine there at that time.

Q.   Do you have any evidence as to why he did that?

A.   Yes.  In an effort to cause the machine to malfunc-
     tion.  They had discussed earlier that Rivers would
     cause the ATM machine to malfunction by bending the
     ends of his ATM card, and by causing the machine to
     jam it would cause Cooper, who was the ATM respon-
     dent for Pickerton, to be called out to make a ser-
     vice call at that particular location, at which time
     Rivers would approach him with a handgun and demand
     the money.

Q.   Did that in fact happen on September the 21st, 1994?

A.   On September the 21st Rivers did jam the machine,
     but Rivers advised it did not occur because he got

24

1   Carolina?  Do you have any facts that would support

2   that?

3   A.   Yes.   Rivers provided us with the information that

4   he had in fact, along with Carl Cooper, burglarized

5   the ATM machine at that location.   That Cooper had

6   obtained a key from another Pickerton employee and

7   had entered the machine in the rear while he stood

8   out front as a ---

9   Q.   ."He" being Rivers?

10  A.   "He" being Rivers, stood out front as a lookout for

11  the burglary.

12  Q.   And have you been able to confirm any of that

13  through any other bank records?

14  A.   Through surveillance video Rivers is seen standing

15  in front of the ATM machine on that evening.

16  Q.   Okay.

17  A.   And also, alarm records indicate that the alarm was

18  turned off at approximately 12:00 a.m. on that morn-

19  ing, the 24th.

20  Q.   And what time did this theft occur?

21  A.   At approximately 12:00 a.m.

22  Q.   While the alarm was turned off?

23  A.   Right.   And Rivers is seen standing out on the sur-

24  veillance video tape at approximately the same time.

25  Q.   Okay.   And do you know whether or not on September

25

1    the 24th, 1994; Rivers concealed at his residence a

2    bag containing the $40,000 stolen by Cooper and

3    Rivers from the ATM NationsBank, Festival Center,

4    located at 5101 Ashley Phosphate Road, North

5    Charleston?

6  A.  Yes.  Rivers indicated in his statement also that he

7    maintained the money from this burglary.

8  Q.  And do you have any evidence of whether or not Coo-

9    per gave $10,000 of the $40,000 stolen from the ATM

10   on September the 24th to a Pickerton employee who

11   gave Cooper the key to unlawfully enter the ATM?

12 A.  Based upon Rivers' statement again, Cooper advised

13   him that he was going to pay the person who had

14   given him the key to enter the ATM machine $10,000

15   for allowing him to use the key to do the burglary.

16 Q.  And what evidence do you have as to whether or not

17   Cooper traveled to the state of Georgia to exchange

18   the denominations of the money stolen from the ATM?

19 A.  Based again on Rivers' statement, that Cooper was

20   going to travel to Georgia to exchange the money to

21   larger denominations.

22 Q.  And do you know whether or not Cooper purchased a

23   satellite system at any time utilizing the proceeds

24   stolen from an ATM?

25 A.  Yes.  The week after the robbery -- excuse me, the

26

1    week after the burglary that occurred in September,

2    I think the week of October the 3rd, Cooper pur-

3    chased a satellite system from a satellite company

4    in Summerville, at which time Cooper paid for the

5    satellite with twenty crisp twenty-dollar bills,

6    approximately $2,000.

7  Q.    Has any officer or agent talked to the person who

8    sold the satellite disk to Cooper?

9  A.    Yes, they remember talking with Cooper about the

10    bills being so crisp and new, and Cooper advised

11    them that he had obtained the money from his brother

12    in Georgia.

13  Q.    And do you have any evidence as to whether or not

14    Cooper and Rivers agreed to stage a robbery of an

15    ATM sometime prior to October the 11th with Rivers

16    and another individual?

17  A.    Yes.  Rivers also provided a statement that he and

18    Cooper had planned and staged this robbery with

19    Dwayne Bryant.

20  Q.    And who is Dwayne Bryant?

21  A.    Dwayne Bryant is the individual that is identified

22    as being the second masked man that accompanied

23    Rivers on the night of October the 11th to the rob-

24    bery.

25  Q.    Okay.  And could you just please summarize for the

35

1        where you're utilizing the card.

2    BY JUROR:

3        All of this is based on what Rivers says?

4    BY WITNESS:

5        No.

6    BY JUROR:

7        That's what I've heard so far.

8    BY WITNESS:

9        No, we've been able to go back and look at the sur-

10       veillance video tape where Rivers said that they

11       were at the machine at approximately 12:00.  And we

12       go back and review the videotape and Rivers is at

13       the machine at 12:00.  Then we go back to

14       NationsBank and they're saying, 'Hey, the machine

15       was turned off by someone with an access code to

16       turn the alarm off at approximately 12:00 to 12:07.'

17       And based upon that, the only person that would have

18       had the access code to enter the ATM machine would

19       have been someone who knew the access code to turn

20       the alarm off, who would have had the key, and who

21       also would have had the combination.

22   BY JUROR:

23       The Pickerton records put Cooper there at the same

24       time Rivers was there?

25   BY WITNESS:

36

1       Their records can't put him there but Rivers puts

2       him there as being there.  And the only person that

3       would have had the ability to enter the machine

4       would have been a Pickerton employee who would have

5       had access to those two things, the access code to

6       turn the alarm off, the combination and the key.

7  BY JUROR:

8       (Inaudible)

9  BY MS. HENDRICKS:

10       I'm sorry, we couldn't hear that.

11  BY JUROR:

12       You found money at Rivers' house.  Did you find

13       money at Cooper's house?

14  BY MS. HENDRICKS:

15       I don't believe the court reporter can hear you.

16  BY COURT REPORTER:

17       You asked if they ever got any of the money?

18  BY JUROR:

19       If they found money at Cooper's house?

20  BY WITNESS:

21       We never found money at Cooper's house, but during

22       the summer of 1994 Cooper filed bankruptcy.  But

23       during that time period he added almost $20,000

24       worth of revisions to his house.  We've interviewed

25       construction people who indicated that they were

37

1    paid cash money.  Some of them indicated that it was

2    crisp new twenty-dollar bills.

3    BY MS. HENDRICKS:

4        Any other questions at this time?  Seeing that there

5    are no further questions I'll present the proposed

6    indictment to you, Mr. Foreman, and then we'll step

7    outside while you deliberate.

8    (Attorney Hendricks, Witness & Court Reporter Exit)

9    (VOTE)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | **PRESENTENCE INVESTIGATION REPORT** |
| | ) | |
| CARL BENIT COOPER | ) | **Docket No. 2:95-206** |

**Prepared For:**    The Honorable Falcon B. Hawkins
United States District Judge

**Prepared By:**    J. Scott Youngblood
United States Probation Officer

**Assistant U. S. Attorney**

Brucie H. Hendricks
170 Meeting Street
Charleston, S.C. 29401
803-727-4381

**Defense Counsel**

Eduardo K. Curry
P. O. Box 20669
Charleston, S.C. 29402
803-937-0101

**Sentence Date:**

**Offense:**

To be set

**Count One - Conspiracy - Title 18, USC § 371.**
Maximum Penalties: 5 years imprisonment and/or $250,000
fine; not more than 3 years supervised release; $50 special
assessment fee. Class D Felony.

**Count Two - Bank Burglary - Title 18, USC § 2113(b)
and Title 18, USC §2.** Maximum Penalties: 10 years
imprisonment and/or $250,000 fine; not more than 3 years
supervised release; $50 special assessment fee. Class C
Felony.

**Count Three - Armed Bank Robbery - Title 18, USC §
2113(a)(d) and Title 18, USC § 2.** Maximum Penalties:
25 years imprisonment and/or $250,000 fine; not more than
5 years supervised release; $50 special assessment fee. Class
B Felony.

**Count Four - Use of a Firearm in Relation to a Crime
of Violence - Title 18, USC § 924(c) and Title 18, USC
§ 2.** Maximum Penalties: 5 years consecutive to any other
sentence imposed; $250,000 fine; not more than 3 years

supervised release; $50 special assessment fee.   Class D Felony.

**Count Five - Bankruptcy Fraud - Title 18, USC § 152 and Title 18, USC §2.**   Maximum Penalties: 5 years imprisonment and/or $250,000 fine; not more than 3 years supervised release; $50 special assessment fee.   Class D Felony.

| | |
|---|---|
| **Release Status:** | $25,000 secured bond set November 30, 1994.   Bond executed this same date with Pretrial Supervision. September 22, 1995, subject convicted by jury trial and placed in the custody of the U.S. Marshal Service. |
| **Detainers:** | None |
| **Codefendants:** | Wilfred Rivers, Dorothy A. Cooper |
| **Related Cases:** | None |
| **Date of Verdict:** | September 22, 1995 |
| **Date Report Prepared:** | February 19, 1996 |

**Identifying Data:**

| | |
|---|---|
| **Date of Birth:** | March 13, 1949 |
| **Age:** | 46 |
| **Race:** | Black |
| **Sex:** | Male |
| **SSN No:** | 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 |
| **FBI No:** | 757204WA7 |
| **USM No:** | 91121-071 |
| **Other ID No:** | |
| **Education:** | Some college |
| **Dependents:** | 2 |
| **Citizenship:** | U.S.A. |
| **Legal Address:** | 906 N. Palmetto Street, Summerville, S.C. 29483 |
| **Aliases:** | None known |

## PART A. THE OFFENSE

### Charge(s) and Conviction(s)

1.  **Carl Benit Cooper** is one of three codefendants named in a seven count Superseding Indictment filed in the District of South Carolina on March 15, 1995. This defendant is named in all counts. Count One charges that from in or about July 1994, through in or about November, 1994, in the District of South Carolina, the defendants **Carl Benit Cooper** and Wilfred Rivers and others known and unknown to the Grand Jury, did knowingly and willfully combine, conspire, confederate and agree with each other to commit the following offenses against the United States:

    (1)    taking and carrying property in the care and custody of a bank, in violation of Title 18, USC § 2113(b);

    (2)    armed bank robbery, in violation of Title 18, USC § 2113(a), and (d); and

    (3)    using and carrying firearms during and in relation to a crime of violence, in violation of Title 18, USC § 924(c); all in violation of Title 18, USC § 371.

2.  Count Two charges that sometime between September 23 and September 24, 1994, in the District of South Carolina, the defendants, **Carl Benit Cooper** and Wilfred Rivers, did take and carry away with the intent to steal and purloin approximately $40,000 of money belonging to and in the care, custody, control, management and possession of NationsBank of South Carolina, a bank whose deposits were then insured by the Federal Deposit Insurance Corporation, all in violation of Title 18, USC § 2113(b) and 2.

3.  Count Three charges that on or about October 11, 1994, in the District of South Carolina, the defendants, **Carl Benit Cooper** and Wilfred Rivers, by force, violence and intimidation did take from the person and presence of another at NationsBank located at 1020 Anna Knapp Boulevard, Mount Pleasant, South Carolina approximately $47,100 belonging to and in the care, custody, control, management and possession of NationsBank, the deposits of which were then insured by the Federal Deposit Insurance Corporation and in committing that offense, the defendants Wilfred Rivers and Carl Benit Cooper did assault and put in jeopardy the life of another person by the use of a dangerous weapon that is, a firearm, in violation of Title 18, USC § 2113(a)(d) and Title 18, USC § 2.

1

4.  Count Four charges that on or about October 11, 1994, in the District of South Carolina, the defendants, **Carl Benit Cooper** and Wilfred Rivers, during and in relation to the commission of an armed robbery, a crime of violence which is prosecutable in a court of the United States, willfully did use and carry a firearm; in violation of Title 18, USC § 924(c) and 2.

5.  Count Five charges that the defendants, **Carl Benit Cooper** and Dorothy A. Cooper filed a Chapter 13 Bankruptcy Petition on May 19, 1994, known as case number 94-72416, in the United States Bankruptcy Court for the District of South Carolina. This bankruptcy case was in existence at all times relative to this indictment. The bankruptcy filing required that **Carl Benit Cooper** and Dorothy A. Cooper disclose all of their assets then owned or thereafter required to the Trustee, R. Geoffrey Levy, to be administered in accordance with the bankruptcy laws. From on or about June 8, 1994, through October 26, 1994, the defendants, **Carl Benit Cooper** and Dorothy A. Cooper did knowingly and fraudulently conceal property belonging to the estate, in that **Carl Benit Cooper** and Dorothy A. Cooper used monies that were concealed from the estate to make major additions and improvements in the approximate amount of $13,500 to their home at 906 N. Palmetto Street, Summerville, S.C. and did thereby conceal this property belonging to the estate; all in violation of Title 18, USC § 152 and 2.

6.  Count Six charges that on or about May 19, 1994, in the District of South Carolina, the defendants, **Carl Benit Cooper** and Dorothy A. Cooper, did knowingly and fraudulently make a materially false statement under penalty of perjury as permitted under Title 28, USC § 1746 in a case under Title 11, United States Code, in that the Chapter 13 Bankruptcy Petition filed by the defendants listed assets of $15,840 in personal property when, in fact, as the defendants knew, **Carl Benit Cooper** and Dorothy A. Cooper had assets of $166,000 in personal property; all in violation of Title 18, USC § 152 and 2.

7.  Count Seven charges that on or about May 19, 1994, in the District of South Carolina, the defendants, **Carl Benit Cooper** and Dorothy A. Cooper, did knowingly and fraudulently make a materially false statement under penalty of perjury as permitted under §1746 of Title 28, United States Code, in a case under Title 11, Ur̲ ̲ ̲ ̲ States Code, in that the Chapter 13 Bankruptcy Petition filed by the defenda̲ ̲ ̲isted Cash-on-Hand as none when, in fact, the defendants **Carl Benit Coo̲ ̲** and Dorothy A. Cooper had $166,000 in cash and personal property on ̲and; all in violation of Title 18, USC §152 and 2.

8.  Proceeding on to trial the defendant, **Carl Benit Cooper**, was found guilty of Counts One through Five, on September 22, 1995. The charges against his wife, Dorothy A. Cooper, were dismissed. The Assistant United States Attorney bringing this case before the court is Brucie H. Hendricks. Retained counsel for the defendant through the trial was Andrew J. Savage, III, of the Charleston Bar.

Savage was relieved subsequent to Cooper's conviction at the request of the defendant and Eduardo K. Curry of the Charleston Bar was appointed to represent the defendant and has assisted the defendant in filing his objections to the presentence report.

## Adjustment to Pretrial Supervision

9. **Carl Benit Cooper** made his initial appearance on November 23, 1994, before the Honorable Robert S. Carr, United States Magistrate Judge. Bond was set on that date at $50,000 secured. On November 30, 1994, during a bond review hearing, the Honorable Robert S. Carr, United States Magistrate Judge, reduced the defendant's bond to $25,000 surety with special conditions that the defendant shall: (1) Not change his mailing address or place of residence without permission of the court; (2) Avoid all contact with Jerry Williams, Nathan Williams, Wilfred Rivers, and Carlos Anderson; (3) Report on a regular basis to the U.S. Pretrial Services Office nearest his residence; (4) Refrain from possessing a firearm, destructive device or other dangerous weapons; (5) Refrain from any use of alcohol and any use or unlawful possession of a narcotic drug and other controlled substances as defined in Title 21, USC § 802, unless prescribed by a medical practitioner; (6) Submit to random drug testing as directed by Pretrial Services; (7) Not leave the District of South Carolina unless granted permission by the court; (8) Continue counselling with Dr. Rosen; (9) Execute a bond with solvent sureties in the amount of $25,000.

10. The defendant's trial began on September 11, 1995, and on September 22, 1995, subject was found guilty on all five of the remaining counts. During the period of time between November 30, 1994, and the defendant's date of conviction, September 22, 1995, the defendant adhered to all requirements of Pretrial Supervision and attended counseling as ordered by the court with no problems reported whatsoever.

## The Offense Conduct

11. NationsBank is a federally insured financial institution with its corporate headquarters located in Charlotte, N.C. and with branch offices located in South Carolina. This institution operates Automated Teller Machines (ATMs) at several of its branch offices located in the Charleston County, S.C. area. An ATM provides twenty-four hour banking services to customers who possess ATM designated cards and access codes and is supplied with thousands of dollars in U.S. currency and dispenses U.S. currency in denominations of $20 and $5 to bank customers who possess valid ATM cards and ATM access cards.

12. NationsBank maintains a contract with Pinkerton Security and Investigation Services requiring them to respond to ATM malfunctions and security alarms.

3

Carl Benit Cooper, was one of these employed by Pinkerton with this responsibility. Codefendant Wilfred Rivers lived in the same neighborhood as Cooper in Summerville, S.C. and indicates that sometime in 1994, the exact date being unknown, he (Rivers) met Cooper at Cooper's residence located at 906 N. Palmetto Street. Shortly after becoming acquainted, Cooper confided to Rivers that he had previously broken into and stolen money from NationsBank ATMs and showed Rivers large sums of currency which he claimed were the fruits of his crime. Rivers indicates that Cooper told him about a burglary at the Festival Center at Dorchester Road and Ashley Phosphate Road that occurred in July of 1994 on a Saturday morning in which $9,000 was taken. This claim coincides with the fact that during the weekend of July 2, to July 5, 1994, $9,125 was taken from NationsBank's Festival Center ATM. Rivers states he had discussed with Cooper on several occasions about conducting the burglary of NationsBank ATMs. Rivers claims that Cooper described he would either borrow or steal a key from the supervisor because all the keys for the ATM are stored on a large keyring and Cooper knows the combination.  By utilizing the key and combination, they could enter an ATM and remove money from the machines. Rivers concludes that he and Cooper also discussed Rivers serving as a lookout by wearing a Pinkerton uniform and standing outside the ATM while Cooper went inside to remove the money.

13.     Rivers advised the authorities in a December 5, 1994, debriefing that in late September, he, along with Cooper had committed a burglary of the ATM at the Ashley Phosphate Road and Dorchester Road Location. The burglary was to be accomplished by the previous means of a stolen or exchanged key and the combination which Cooper knew. Rivers indicates that on September 24, 1994, he and Cooper were successful as while he (Rivers) made a transaction at the Festival Center, Cooper entered the rear of the ATM and took $30,000 from the storage shelf inside the safe. This is corroborated by the fact that on September 24, 1994, at 12:06 p.m., Rivers is on video using the ATM at the Festival Center. Records indicate that the alarm was turned off at 12:05 a.m. and turned back on at 3:15 a.m. At 3:14 a.m. a car headlight can be seen driving up the ATM. Rivers stated he believes the amount taken was $30,000 as that is what he was told by Cooper, however subsequent investigation confirmed that in actuality $40,180 had been taken from the storage shelf inside the safe of this unit. Rivers received $10,000 of this money.

14.  ⁻ Cooper became a bit more brazen in his means by which to obtain cash when he began to discuss staging a robbery using Rivers as the perpetrator of the robbery with Cooper acting as if he, as his partner, was being caught off guard and assuming the role of a victim. Rivers states that during the latter part of August or the first part of September, 1994, he and Cooper decided they would attempt to plan a staged robbery at the NationsBank ATM at Ashley Crossing on Highway 61 in Charleston. Rivers stated in his debriefing by the Federal Bureau

4

of Investigation that Cooper demonstrated how that if one would bend the ends of an ATM card before inserting it into the ATM machine it would cause the machine to jam. The NationsBank security person monitoring the machine would then receive information that the machine had malfunctioned and would then dispatch Cooper and his ATM responder partner to that machine to repair the malfunction. Rivers and Cooper discussed that Rivers would jam the ATM with his ATM card and once Cooper and his partner received a dispatch to that machine, Rivers would call Cooper to that side of that building and advise him that this was a robbery, remove Cooper's service revolver and then order Cooper to call his partner to the side of the building at which time Rivers would take his partner's service revolver also. Rivers would then have Cooper remove the money from the ATM machine and give it to the defendant. Their initial attempt at this type of robbery took place at Ashley Crossing and commenced according to plan; however, Rivers waited for several hours, but Cooper nor any other Pinkerton security guard showed up on that occasion. Rivers states that the next day, he contacted Cooper and asked him why he didn't show up at Ashley Crossing so they could do the robbery and Cooper responded that Rivers had waited too late to jam the machine as Pinkerton would not dispatch security persons to open the machines after 10:00 p.m. Cooper maintains that Pinkerton has a 7:00 p.m. to 11:00 p.m. service shift.

15. Approximately one week after this unsuccessful attempt at the planned robbery at Ashley Crossing, Rivers and Cooper decided to utilize the same plan at the same bank again, but Rivers was unsuccessful again as he attempted to jam the machine after 9:00 p.m. and Pinkerton Security did not dispatch Cooper to the bank on this occasion either. Rivers is not sure of the exact dates of the failed robbery attempts, but remembers that he tried on at least three occasions to perpetrate a bank robbery of Cooper and his partner at the Ashley Crossing. Rivers indicated to the FBI that at Ashley Crossing he utilized his Wachovia ATM card to jam the machine on the first occasion and on the second occasion he used a "Pepsi Generation" advertisement card to jam the machine, and on the third occasion he utilized a Heritage Trust Federal Credit Union ATM card to jam the machine.

16. On the last of these series of attempts, Rivers had successfully jammed the ATM machine and Cooper and his partner responded to the Ashley Crossing ATM. As Cooper arrived, he waved off Rivers and explained at a later date that Pinkerton Security Company was out making random checks of responders because they had experienced vandalism of some of the Pinkerton vans. Rivers states that Cooper advised him that they could do the robbery later in the week; however, Rivers states that he advised Cooper that he did not want to do the robbery at Ashley Crossing because he believed that he was on the video tape too frequently.

17.     Rivers goes on to explain that in the latter part of September, 1994, he met
        Cooper at Cooper's residence to discuss planning another robbery. **Cooper**
        advised Rivers that to make the robbery look more realistic he should utilize
        handcuffs to restrain **Cooper** and his partner. **Cooper** then provided Rivers with
        $20 to buy handcuffs to be utilized in the robbery. Rivers and **Cooper** decided
        that they would attempt to stage the robbery this time at the NationsBank ATM
        on Ashley Phosphate and Dorchester Road. On the evening of the robbery at
        approximately 8:00 p.m., Rivers, utilizing his ATM card, jammed the
        NationsBank ATM at Ashley Phosphate Road. Rivers then went across the street
        to the Speedway service station where he could watch the bank parking lot and
        also the shopping center. Rivers then paged **Cooper** on his digital pager. He
        could see **Cooper** at the shopping center talking with another Pinkerton security
        guard, a white male driving a Pinkerton security car, but **Cooper** did not call him
        back. Rivers then went to the Burger King located across the street from the
        Speedway service station where he could still observe **Cooper** talking with the
        security guard. Rivers then paged **Cooper** from the Burger King. **Cooper** then
        telephoned Rivers back. Rivers could observe **Cooper** using the security guard's
        telephone to talk with him. During this conversation, **Cooper** talked in codes and
        advised him to go through with the plan. **Cooper** then called Rivers back from
        a Waccamaw store nearby. During this conversation **Cooper** advised Rivers to
        go ahead and get in position because he had to wait on his partner to arrive
        before they could open the ATM. Rivers explained that he was concerned that
        there was a security guard on duty in the parking lot of the shopping center that
        would possibly attempt to foil the robbery. **Cooper** explained to Rivers not to
        worry that he had everything under control. Rivers then became scared because
        he not only had to worry about **Cooper's** normal security partner, but also had
        to worry about the security guard in the parking lot. According to Rivers, based
        on his reservations, the robbery was not carried out. Rivers in testimony at trial
        did not provide the explanation given in debriefing but indicated he could not
        carry out the plan as he was "stuck in the woods and could not go any further.
        And besides that, the mosquitos had bitten me up so bad".

18.     Rivers went to **Cooper's** house the following day. **Cooper** was upset with Rivers
        for not going through with the robbery and advised Rivers that the ATM had over
        $100,000 in currency inventory. It was at that time Rivers and Cooper discussed
        setting up the next robbery attempt at the NationsBank in Mount Pleasant. Rivers
        indicates that he decided that in order to successfully carry out the staged
        robbery, he would need a second person to act as a perpetrator. Rivers states he
        decided to include one Jay Brown in the planned robbery of Cooper and his
        partner, however, later recanted this information acknowledging he had lied to
        the investigators and that in actuality the accomplice chosen was one Dwayne
        Bryan. Rivers is certain that Cooper's normal partner from Pinkerton security
        had nothing to do with the robbery. In testimony at trial, Rivers stated he met
        with Bryan "maybe two weeks" before the robbery at which time he explained to

6

Bryan that he and Cooper had been planning to conduct a staged robbery while Cooper and his partner attempted to fix a malfunction in an ATM. He explained to Bryan that they were expecting to get over $100,000 and that the money would be split three ways. Cooper had never met Bryan before the robbery, but Rivers had told Cooper about using Bryan during the meeting on the day of the robbery. Earlier during the day of the robbery, October 1, 1994, Rivers met with Cooper, and discussed how the robbery would take place and agreed that Rivers would provide the gun to be utilized during the robbery. Rivers traveled to Mount Pleasant earlier during the evening of the robbery with Bryan in a red Mazda RX-7, but decided that the Mazda stood out too much. Later he returned to his residence and parked his car and left again in Rivers' wife's green Ford Taurus. Rivers and Bryan then traveled to the· NationsBank ATM at Anna Knapp Boulevard at which time Rivers attempted to jam the ATM utilizing his Heritage Trust ATM card. Rivers was not sure that the machine had been successfully jammed so he came back a second time to see if the ATM monitor indicated it was out of service. The machine did not appear to be out of service or jammed, but the machine had captured his card on the first try.

19.  Rivers and Bryan then left the bank parking lot and went to a nearby service station where they utilized a pay telephone to page Cooper. Cooper did not call them back immediately so they returned to the bank parking lot at which time they passed by the ATM for a third time. Cooper arrived in his Pinkerton van as they were passing through the ATM machine and waved to them as if giving them a sign that everything was okay. Rivers and Bryan then went down the street at which time they put on masks and then returned to the bank parking lot. Rivers exited the vehicle and Bryan parked the vehicle in a parking space on the opposite side from the ATM machine. Rivers then hid behind the bank building. Cooper was kneeling down in front of the ATM machine as if attempting to repair the malfunction while his partner, a white male, stood nearby with his hands in his pockets. Rivers then came from behind the building holding a pistol on Cooper's partner. Bryan then approached Cooper's partner from the rear. Cooper's partner was startled and fell backward onto the ground at which time Bryan removed his service revolver and took him to the far side of the van out of sight of Rivers and Cooper. Cooper then began shouting "You can have the money, just don't kill me and my partner." Cooper began removing cassettes from the ATM and putting them in the rear of the van. Rivers believes that Cooper removed four to five cassettes from the ATM. During this time while Cooper was removing cassettes from the ATM machine, Rivers pulled off his mask so that if a bank customer drove by they would not surmise that a bank robbery was in progress. Rivers then put back on his mask after Cooper had removed all of the cassettes and got into the rear of the van. Cooper removed the money from the cassettes and placed it into a bag that was located inside of the van. Bryan then escorted Cooper's partner into the van at which time Rivers attempted to handcuff Cooper to the red box in the van, but the handcuffs broke.

7

Rivers then utilized duct tape that he had brought with him to tape Cooper's partner and then to tape Cooper. Rivers advised that Cooper was not taped too securely because he ran out of duct tape. Rivers and Bryan then exited the van, taking the bag of money and got into Rivers wife's vehicle which they had previously parked and proceeded down Highway 17-A to Interstate 526 headed to Goose Creek.

20. While in Goose Creek, Rivers went to the Blue and Gold Junkyard on Old Black River Road at which time he attempted to burn the mask he had worn during the robbery. He placed the leather jacket that he had worn during the robbery in a burned out and abandoned car that was to be demolished at the junkyard. The service revolver that was taken from Cooper's partner was thrown into the Goose Creek reservoir by Bryan shortly after leaving the junkyard. Rivers then drove Bryan to the Econo Lodge in Summerville where they split the money.. Bryant then removed several stacks of money from the bag that had been taken from the ATM, total amount of currency unknown. Rivers then drove to his residence at which time he stored the bag of money in the shed behind his home. Rivers indicates he removed three stacks of $20 bills totalling $6,000 from the bag before he stored the remainder of the money. At approximately 8:20 a.m. to 8:30 a.m. Cooper came to Rivers' residence at which time he asked Rivers to give him his share of money. Rivers states he gave Cooper $9,000 of Rivers' money so that Cooper could convert it into larger bills. Cooper explained to Rivers that he had called his (Rivers') house, but his wife had explained that he had already left home on the evening of the robbery. Rivers states that Cooper explained that he was going to tell Rivers there was no need in attempting to jam the machine because he had already received a service call to that machine for an unrelated function, but Rivers had already left home enroute to the NationsBank in Mount Pleasant/ Cooper advised Rivers that they had taken $46,000 the night before, however, the machine was supposed to have $160,000, but the Pinkerton security guards who were responsible for loading the new money into the machine had decided because it was raining they would load the machine the following day.

21. Cooper explained that his partner who had been present during the robbery had been polygraphed by the police and had failed the polygraph exam and that local police and the FBI were investigating the robbery and that they should "cool out for a while". Rivers states that Cooper also agreed to launder the money for the other Pinckerton employee from whom he had obtained the key turning the $20 into larger bills for the person; however, Rivers states that Cooper was upset with this other individual because this person became disgruntled because he had only received $10,000 for his contribution and had told Cooper that he needed $20,000.

8

22.    Wilfred Rivers was initially interviewed by investigating agents at the Dorchester County Sheriff's Office in Summerville, S.C. on November 10, 1994, and subsequently interviewed on at least two other occasions. However, inconsistencies in the information provided by Rivers prompted his arrest at the United States Attorney's Office in Charleston, S.C. by the investigating agents on December 1, 1994. Rivers was arrested based upon an arrest warrant issued by U.S. Magistrate Judge Robert S. Carr on November 22, 1994, for Bank Robbery, Use and Carrying of a Firearm During a Crime of Violence, Conspiracy to Commit Bank Robbery, and Aiding and Abetting. Rivers was interviewed again subsequent to his arrest on at least two other occasions, each time expanding on what he had previously provided the investigating agents and acknowledging some untruthfulness on his part. On January 1, 1995, he was interviewed at the office of the FBI with his attorney, Assistant Federal Public Defender, Michael P. O'Connell, and provided a revised account of the activities surrounding this indictment which proved to be useful information leading to the filing of a seven count Superseding Indictment naming **Carl Benit Cooper**, Wilfred Rivers and Dorothy A. Cooper, March 15, 1995.

23.    Beyond the conduct surrounding the previously described burglary and robbery, the defendant was charged with three counts of Bankruptcy Fraud, two of which were dismissed during the trial and one of which **Cooper** was found guilty on September 22, 1995. The nature of the conviction as to Count Five of the Superseding Indictment is based on the fact that **Cooper** and his wife filed for bankruptcy under Chapter 13 in May of 1994. **Cooper** had previously filed bankruptcy in 1976 and in 1983. Despite the bankruptcy filing, **Cooper** made arrangements for approximately $13,500 in home improvements with approximately ten contractors and subcontractors between June and October of 1994. The improvements included a two-car garage, satellite television system, a fence which **Cooper** asserts was paid for prior to declaring bankruptcy, screened-in porch, a swimming pool and pool shed (the pool was never completed). The investigation revealed that **Cooper** paid the contractors with what appeared to be "fresh" cash, cash which appeared to have come directly from a bank or automatic teller machine without having been previously circulated. This cash was in the form of $5 and $20 bills. One contractor that **Cooper** paid with this new currency indicated that the bills he received were in sequential order by serial number.

24.    The Bankruptcy Petition filed on May 19, 1994, by **Cooper** and his wife was known as Case No. 94-72416, and was in existence at all times during the acts leading to the various counts in this indictment. On or about May 19, 1994, R. Geoffrey Levy was appointed as the Chapter 13 Trustee for the bankruptcy estate of both **Cooper** and his wife. In connection with their bankruptcy filing, **Carl Benit Cooper** and Dorothy A. Cooper were required Title 11, United States Code, to disclose all of their assets then owned or thereafter acquired to the

9

Trustee to be administered with accordance with the bankruptcy laws. During trial, the Government adequately proved that a minimum of $13,500, monies believed to be proceeds of Cooper's illegal activities with regards to Nationsbank, were used to make major additions and improvements to their home at 906 N. Palmetto Street, Summerville, S.C. (As previously noted Cooper asserts the fence discussed earlier had been paid for prior to the declaration of bankruptcy). These monies were never reported to the Trustee (Levy) or the bankruptcy estate of Cooper and his wife. This placed the defendant in violation of Title 18, USC § 152 and 2.

## Victim Impact Statement

25.    As Pinkerton Security is not only responsible for responding to ATM malfunctions, but are allocated currency through specific accounts to replenish cash inventories of these bank branches, Pinkerton is the actual incurrer of financial loss in this case. This is verified by George Ross, head of corporate security for NationsBank. The defendant was solely responsible for responding to ATM malfunctions and not the replenishment of currency. Contact with Diane Good of the Risk Management Department of Pinkerton Security, Encino, California, indicates that total losses incurred by Pinkerton as a result of the activities of the perpetrators of these offenses were $40,180 and $47,175 for a total of $87,355. Carl Benit Cooper will be held accountable for this amount for loss and restitution purposes, restitution to be proportionally divided among co-defendants at the time of sentencing.

## Adjustment for Obstruction of Justice

26.    The U.S. Probation Officer has no information that would suggest the defendant impeded or obstructed justice in this prosecution.

## Adjustment for Acceptance of Responsibility

27.    The defendant has continuously denied his participation in the conduct comprising the instant offense and proceeded on to trial which ultimately led to a conviction on all counts charged. Cooper's conduct post-arrest has failed to meet any of the criteria of §3E1.1 and thus, he is afforded no point reductions based on Acceptance of Responsibility.

## Offense Level Computations

28.    The 1994 edition of the U.S. Sentencing Commission Guidelines Manual has been used in this case.
Count One - Conspiracy
Count Two - Bank Burglary

29. **Base Offense Level:** The analogous guideline for a violation of Title 18, USC § 2113(b) and Title 18, USC § 371, grouped, is U.S.S.G. §2B1.1, Larceny, Embezzlement and Other Forms of Theft: Receiving, Transporting, Transferring, Transmitting or Possessing Stolen Property which dictates a base offense level of 4.

<u>4</u>

30. **Specific Offense Characteristics:** As the loss exceeded $40,000 however, was not more than $70,000, the offense level is increased by 7 pursuant to subsection 2B1.1(b)(1)(H).

<u>+7</u>

31. As the offense involved more than minimal planning, the offense level is increased by 2 pursuant to subsection 2B1.1(5)(A).

<u>+2</u>

32. **Adjustment for Role in the Offense:** It is the determination of the U.S. Probation Office that this defendant was an organizer and leader of this criminal activity warranting a 2 level increase.

<u>+2</u>

33. **Victim Related Adjustment:** None.

<u>0</u>

34. **Adjustment for Obstruction of Justice:** None.

<u>0</u>

35. **Adjusted Offense Level (Subtotal):** Fifteen.

<u>15</u>

### Count Three - Armed Bank Robbery.

36. **Base Offense Level:** The analogous guideline for a violation of Title 18, USC § 2113(a) and (d) is subsection 2B3.1, Robbery, which dictates a base offense level of 20.

<u>20</u>

37. **Specific Offense Characteristics:** As the property of a financial institution was taken the offense level is increased by 2 pursuant to subsection 2B3.1(b)(1)(A).

<u>+2</u>

38. As a person was physically restrained to facilitate commission of the offense, the offense level is increased by 2 pursuant to subsection 2B3.1(b)(4)(B).

<u>+2</u>

39. As a firearm was taken, the offense level is increased by 1 pursuant to subsection 2B3.1(b)(5).

<u>+1</u>

40. As the loss exceeded $10,000, however, was not more than $50,000, the offense level is increased by 1 pursuant to subsection 2B3.1(b)(6)(B).

<u>+1</u>

11

41.  **Adjustment for Role in the Offense:**  It is the determination of the U.S. Probation Office that this defendant was an organizer and leader of this criminal activity warranting a 2 level increase.                                                                                                          **+2**

42.  **Victim Related Adjustment:** None.                                                                                                    **0**

43.  **Adjustment for Obstruction of Justice:**  None.                                                                              **0**

44.  **Adjusted Offense Level:**  Twenty-Eight.                                                                                    **28**


**Count Four** - Possession of a Firearm in Relation to a Crime of Violence.

45.  **Base Offense Level:**  The analogous guideline for a violation of Title 18, USC § 924(c) is §2K2.4 which indicates that the term of imprisonment is that which is required by statute.  Title 18, USC § 924(c) requires that an individual who uses or carries a firearm during and in relation to any crime of violence or drug trafficking crime shall be sentenced to imprisonment for five (5) years which shall run consecutively to any other sentence imposed.


**Count Five** - Bankruptcy Fraud

46.  **Base Offense Level:**  The analogous guideline for a violation of Title 18, USC § 152 is found in §2F1.1 and dictates a base offense level of 6.                                                              **6**

47.  **Specific Offense Characteristics:**  On May 19, 1994, the defendant filed a Chapter 13 Bankruptcy Petition listing assets of $15,840.  Subsequent investigation indicates that in actuality **Cooper** had personal property worth approximately $166,000.  This information was gained through U.S. Bankruptcy Court Trustee Geoffrey Levy, the Town of Summerville, contractors as to cash payment, and Wilfred Rivers as to monies taken by he and **Cooper**. Additionally, **Cooper's** mortgage company indicates that the defendant listed $162,000 in personal property and his insurance company indicates he listed $112,000 in insurable property.  Based on the above, it is the determination that **Cooper's** fraud and deceit with regards to personal property reported and actual personal property owned at that time would total $150,160 which dictates an offense level increase of 7 pursuant to U.S.S.G. §2F1.1(b)(1)(H).                             **+7**


48.  **Adjustment for Role in the Offense:**  None.                                                                              **0**

49.  **Victim Related Adjustment:**  None.                                                                                        **0**

12

50.   **Adjustment for Obstruction of Justice:**  None.                              **0**

51.   **Adjusted Offense Level (Subtotal):** Thirteen.                              **13**

Multiple-Count Adjustment  (See § 3D1.4)

|  |  | Units |
|---|---|---|
| 52. | Adjusted Offense Level for Counts One and Two 15 | 0 |
| 53. | Adjusted Offense Level for Count Three          28 | 1 |
| 54. | Adjusted Offense Level for Count Five           13 | 0 |
| 55. | Total Number of Units                              | 1 |
| 56. | Greater Adjusted Offense Level                  28 |  |
| 57. | Increase in Offense Level                        0 |  |

58.   **Combined Adjusted Offense Level:** Twenty-Eight.                            **28**

59.   **Chapter Four Enhancements:**  None.                                         **0**

60.   **Adjustment for Acceptance of Responsibility:**  None.                       **0**

61.   **Total Offense Level:**  Twenty-Eight.                                       **28**


# PART B.  DEFENDANT'S CRIMINAL HISTORY

### Juvenile Adjudication(s)

62.   None known.

### Adult Criminal Conviction(s)

63.   None known.


### Criminal History Computation

64.   The absence of criminal convictions noted above results in 0 criminal history
      points.  According to the Sentencing Table, Chapter V, Part A, 0 or 1 criminal
      history point equates to a criminal history category of I.

### Other Criminal Conduct

65.   None known.

### Pending Charges

66.   None known.

### Other Arrests

67.   None known.

## PART C.  OFFENDER CHARACTERISTICS

### Personal and Family Data

68.   **Carl Benit Cooper** was born on March 13, 1949, in Camden, N.C. to the union of Winfred and Alva Ruth Cooper (nee) Sawyer.   Subject was reared by his biological parents along with four brothers and six sisters consisting of: 47 year old brother, Winfred Cooper, Jr., of Camden, N.C.; 45 year old brother, Melvin Cooper, of Elizabeth City, N.C.; 46 year old sister, Dolly Cooper, of Raleigh, N.C.; 42 year old sister, Marie Cooper, of Raleigh, N.C.; 41 year old brother, Kenneth Cooper, of Elizabeth City, N.C.; 39 year old brother, Donald Cooper, of Moyock, N.C.; 36 year old sister, Louise Wooten, of Moyock, N.C.; 35 year old sister, Mary Etheridge, of Moyock, N.C.; 34 year old sister, Alva Ruth Cooper, of Moyock, N.C.; and, 32 year old sister, Kimberly Bailey, also of Moyock, N.C.  The defendant states that his father passed away in 1976 as a result of a heart attack; however, during the course of his life was primarily a farmer.   The defendant's mother, who occupied the role of a housewife and mother, died in March of 1991 as a result of a stroke.  **Cooper** relates that he had the benefit of very loving parents and experienced a close relationship with all of his siblings.  He indicates the family was quite poor and relied often on welfare due to the fact that although his father had the ability to farm, he was an alcoholic and did not care much for work.   Subject was raised primarily in the area of Camden, N.C.

69.   In 1971, the defendant married Florence Ferebee in Camden, N.C.  Two children were born to this union.  They are 23 year old Nita Cooper and 22 year old Nacita Cooper, both residents of Shawboro, N.C.  Subject's marriage to Florence Ferebee Cooper ended in divorce in 1982.  On December 22, 1982, the defendant married Dorothy Bradshaw in Aiken, S.C.   Mrs. Cooper was initially a codefendant in this case, but charges were eventually dropped.  **Cooper** states that at the time of this interview that the events surrounding his conviction had shaken

*Cooper* ☙ *21-071*

his marriage, however, it has remained intact and Dorothy Cooper has since moved back to her hometown in Georgia. No children were born to this union; however, Mrs. Cooper brought five children into this union from a previous marriage consisting of: 30 year old, Ed Willie Emery; 28 year old, Tonya Maliard; 27 year old, Sharon Johnson; 26 year old, Marva Johnson; and, 22 year old, Michelle Johnson.

70.   **Cooper** revealed also that he fathered a child out of wedlock with one Nellie Thomas. The child's name is Carl Cooper who would be at this time 17 years of age and residing in Petersburg, Virginia.

### Physical Condition

71.   The defendant is a black male, standing 6'4", weighing 250 pounds with graying black hair which is balding, brown eyes, and sporting a goatee at the time of this interview. Other distinguishing marks would include a tatoo inside his left forearm, "CBC + FTF". Additional marks would include a 6" vertical scar on his back related to previous medical history which includes two back surgeries in which a disc was removed (L-1) in February of 1991 and a disc (L-3) was fused in March of 1991. These surgical procedures occurred while the defendant was stationed in Germany with the U.S. Army. Subject states he has extreme arthritis in his legs and experiences high blood pressure for which he takes Lotensin in the form of 10 mg daily. Subject indicates he is required by the Veteran's Administration to wear a back brace ninety percent of each day. **Cooper** reports to have a non-cancerous spot on his lung, however, this has not been confirmed.

### Mental and Emotional Health

72.   In an interview with this officer, subject appeared to be functioning normally; however, became quite emotional at the end of the discussion, again reluctant to acknowledge the full extent of his crime and depressed about a possible lengthy incarceration. The defendant, however, concluded with the fact that he knows he will be successful in dealing with whatever is imposed upon him by way of his religious beliefs.

### Substance Abuse

73.   According to the defendant, he has never used nor experimented with any form of any illegal controlled substance. In a Pretrial Services interview conducted by David J. Harrison, subject stated that he does consume alcoholic beverages to

15

include what had been an average of a six-pack of beer per week along with two mixed drinks. All urinalyses prior to the defendant's trial yielded negative results for the unlawful use of drugs.

## Education and Vocational Skills

74. According to the defendant, he dropped out of Marian Anderson High School located in Belcross, N.C. during the 8th grade to assist his family financially. After dropping out, subject indicates he joined the Job Corp and remained in Morganville, Kentucky from approximately April of 1968 until February of 1969. In addition, the defendant reports he received two Associate's Degrees. The first degree he received from St. Leo College in Florida in 1978 majoring in General Education. His second degree received was in 1980 from the University of Maryland and was a Bachelor of Science in Management. Cooper adds that he received a Master's degree, again from the University of Maryland in 1991. Contact with the registrar's office of University College, University of Maryland reveals the defendant obtained his Associates of Arts (2 year) degree in Management Studies in 1991 and his Bachelor of Science degree in Management in January of 1992. University College, one of eleven campuses associated with the University of Maryland, offers continuing education programs for military personnel in Europe and Asia.

## Employment

75. On March 20, 1969, the defendant enlisted in the United States Army entering as an E-1 Private. During his course of service, the defendant received such honors as the Bronze Star Medal, Meritorious Service Medal, Army Commendation Medal, Army Achievement Medal, Good Conduct Medal, National Defense Service Medal, Professional Development Ribbon, Army Service Ribbon, Overseas Service Ribbon, Expert Marksmanship Badge for pistol, 45 caliber, the Air Assault Badge, Drill Sergeant Identification Badge, and the Southwest Asia Service Medal.

76. Subject remained stateside from approximately March of 1969 until September of 1969 when he was transferred to Germany. Cooper remained there until approximately September of 1975, then on to Ft. Lee, Virginia where he stayed for approximately four years. His next assignment was in December of 1979 at Ft. Gordon, Georgia until 1981 when he was transferred to Korea. From Korea, Cooper returned stateside to Campbell, Kentucky and from there he returned to Georgia in approximately August of 1983 where he remained until October 1983, then back to Ft. Lee, Virginia from November 1986 until February 1987; February 1987 until August 1989, Fort Polk, Louisiana; August 1989 until September 1992 again located in Germany. The defendant ended his military career while stationed at Ft. Gordon, Virginia, where he retired based on

permanent physical disability relating to back problems previously described in paragraph 71. The defendant's rank at retirement was that of E-9, Command Sergeant Major.

77.    From January 1994, until November 1994, the defendant was employed by Pinkerton Security as an ATM responder earning $6.50 per hour. His supervisor was Jerry Williams and the defendant's reason for leaving was the nature of the instant offense.    From November of 1994 until February 1995 subject was unemployed. From February 1995, until November 1995, subject was employed by the Presbyterian Home of Summerville, S.C. as a janitor earning $7 per hour. Subject's reason for leaving was that his trial commenced September 11, 1995.

78.    A letter written by Walter E. Hickman, Jr., Administrator of the Presbyterian Home of South Carolina, Summerville, states that during Cooper's employment he was exemplary in the sense of loyalty, performance and behavior. He worked extremely well with his peers and the residents, all of whom were senior citizens, were extremely fond of Cooper and deeply appreciated his respect towards them and his service in their behalf. There was never any question of Mr. Cooper's honesty per Hickman, who indicated that he would rehire Cooper should a position be available upon the defendant's release. An additional letter written by the Chaplain of the Presbyterian Home of South Carolina, Summerville, J. Decherd Guess, stated that Cooper began working in their housekeeping department, but quickly demonstrated skills and ability to be moved into the maintenance department where he functioned as a foreman on an important project. Wherever he worked, he had been a favorite of both residents of the home and co-workers. Guess indicated Cooper's disposition and personality did much to brighten the day of those with whom he had contact. Guess adds that the defendant even functioned as a mentor to one of the less experienced employees, helping him both personally and professionally. Guess concluded that the fact that both Cooper's supervisor and a fellow co-worker's continue to visit him faithfully during his incarceration support the chaplain's positive regard for Mr. Cooper.

## Financial Condition:  Ability to Pay

79.    At the time of the interview with this defendant, Cooper reported to this officer that he had no information he could pass on with regard to his financial situation as he had been incarcerated and as his wife had since left their residence and returned to Georgia. He could only state that he knew his primary residence was for sale, the value of which is approximately $160,000.  At the time of his Pretrial Services interview, subject stated that his personal property amounted to approximately $120,000 and he had a life insurance policy that had a death

17

benefit of approximately $150,000. Checking and Savings accounts at that time totaled approximately $1,130. Subject indicated during that interview that his primary liability at that time was his mortgage to Southern National Bank which amounted to $147,000. Income from his retirement is approximately $1,866 per month. Subject incurs no additional income as he is in a custodial status and is unfamiliar with any of his liabilities except that he indicates he owes approximately $25,000 in legal fees. Previous bankruptcy declarations are described in the instant offense, at which time the defendant was subject to the requirements of Title 11, based on his May 19, 1994, Chapter 13 Bankruptcy Petition, Case No. 94-72416. Contact with Bankruptcy Trustee, R. Geoffrey Levy, reveals that the defendant's wife, who now resides in Georgia, has surrendered the property at 930 Palmetto Street, Summerville S.C. which is now in the hands of BB&T Bank. Levy states that Mrs. Cooper continues to make bankruptcy payments in the amount of $412.00 monthly and there remains a limited amount of secured debt but a greater amount of unsecured debt outstanding. Bankruptcy claim records are part of the defendant's file and available to the Court.

## PART D.  SENTENCING OPTIONS

### Custody

80. **Statutory Provisions:** <u>Count One</u>: The maximum term of imprisonment as to Count One, a Class D felony, is five (5) years. Title 18, USC § 371.

81. <u>Count Two</u>: The maximum term of imprisonment as to Count Two, a Class C felony, is ten (10) years. Title 18, USC § 2113(b).

82. <u>Count Three</u>: The maximum term of imprisonment as to Count Three, a Class B felony, is twenty-five (25) years. Title 18, USC § 2113(d).

83. <u>Count Four</u>: The maximum term of imprisonment as to Count Four, a Class D felony, is ⸱ years consecutive to any other term of imprisonment imposed. Title 18. § 924(c)

84. <u>Count Five</u>: The maximum term of imprisonment as to Count Five, a Class D felony, ⸱ (5) years. Title 18, USC § 152.

85. **Guideline Provisions:** <u>Counts One, Two, Three and Five</u>: Based on a total offense level of 28 and a criminal history category of I, the guideline imprisonment range is 78 to 97 months.

86. <u>Count Four</u>: The guideline range is 60 months consecutive.

**Impact of Plea Agreement**

87.    Not applicable.

**Supervised Release**

88.    **Statutory Provisions:**    Counts One, Two, Four and Five:    If a term of imprisonment is imposed, the court may impose a term of supervised release of not more than three (3) years pursuant to Title 18, USC § 3583(b)(2).

89.    Count Three:    If a term of imprisonment is imposed, the court may impose a term of supervised release of not more than five (5) years pursuant to Title 18, USC § 3583(b)(1).

90.    The court shall order as a condition of supervised release that the defendant submit to a urinalysis test for the unlawful use of a controlled substance within fifteen (15) days of release from imprisonment and at least two (2) periodic urinalysis tests thereafter, pursuant to Title 18, USC 3583(d). This condition may be ameliorated or suspended as provided in Section 3563(a)(4). (Effective only for offenses committed on or after September 13, 1994).

91.    **Guideline Provisions:**    The guideline range for a term of supervised release is at least three (3) years, but not more than five (5) years pursuant to U.S.S.G. §5D1.2(b)(1). If a sentence of imprisonment of one year or less is imposed a term of supervised release is not required, but is optional. U.S.S.G. §5D1.1(b). Supervised release is required if the court imposes a term of imprisonment of more than one (1) year. U.S.S.G. § 5D1.1(a).

**Probation**

92.    **Statutory Provisions:**    The defendant is ineligible for a sentence of probation statutorily as Count Three is a Class B felony which requires a sentence of imprisonment. Title 18, USC § 3561(a)(3).

93.    **Guideline Provisions:**    Because the applicable guideline range is in Zone D of the Sentencing Table, the defendant is not eligible for probation pursuant to U.S.S.G. §5B1.1(a).

**Fines**

94.  **Statutory Provisions:** The maximum fine as to each count is $250,000 pursuant to Title 18, USC § 3571.

95.  A special assessment of $50 as to each count for a total of $250 is mandatory. Title 18, USC § 3013.

96.  Among other statutory considerations, when ordering a fine or restitution, the Court shall also consider the financial resources of the defendant, financial needs and earning ability of the defendant and the defendant's dependents and such other factors as the Court deems appropriate. A fine is not to impair the ability to make restitution. 18 USC §3572 and 18 USC §3664.

97.  **Guideline Provisions:** The guideline fine range is $12,500 to $125,000. U.S.S.G. §5E1.2(c)(3).

98.  Subject to the defendant's ability to pay, the Court shall impose an additional fine amount that is at least sufficient to pay the cost to the government of any imprisonment, probation or supervised release according to U. S. Sentencing Commission Guidelines Section 5E1.2(i). The most recent advisory from the Administrative Office of the United States Courts, dated March 10, 1995, suggests a monthly cost of $1,779.33 to be used for imprisonment, a monthly cost of $195.30 for supervision, and a monthly cost of $1,183.08 for offenders in halfway houses.

**Restitution**

99.  **Statutory Provisions:** Restitution may be ordered pursuant to Title 18, USC § 3663.

100. **Guideline Provisions:** The court shall enter a restitution order if such an order is authorized under Title 18, USC § 3663 and 3664, pursuant to U.S.S.G. §5E1.1(a)(1).

101. Diane Good of the Risk Management Department of Pinkerton Security, Encino, California, indicates that total losses incurred by Pinkerton as a result of the activities of the perpetrators of these offenses were $40,180 and $47,175 for a total of $87,355. **Carl Benit Cooper** will be held accountable for this amount for loss and restitution purposes, restitution to be proportionately divided among co-defendants at the time of sentencing. Restitution should be directed to Pinckerton Security, Risk Management Department, Att: Diane Good, 15910

20

Ventura Blvd., Encino, Ca. 91436 - 2810 and should reference this case. Telephone contact is (818) 380-8838.

## PART E.  FACTORS THAT MAY WARRANT DEPARTURE

102.    There are no known mitigating or aggravating circumstances concerning this offense or this defendant which would warrant a departure from the prescribed guideline range.

Respectfully submitted,

James W. Duckett, Jr.
Chief U. S. Probation Officer

By:  _____
J. Scott Youngblood
U. S. Probation Officer

\jb
March 5, 1996

Approved:

Peggy B. Swails
Supervising U. S. Probation Officer

21

WILFRED RIVERS - DIR. EX. BY MS. HENDRICKS    182

1    because his house sits on a pier.  I've never been

2    underneath his house, but I saw him.

3         Q.  When was that?

4         A.  If I'm not mistaken, it was in September

5    also.

6         Q.  You've observed him going underneath his

7    house?

8         A.  Yes, I have.

9         Q.  On that particular occasion that you've

10   just described?

          A.  Yeah.  Excuse me, could you back up?  I

     don't want to commit myself to saying yes to something.

     You said on that particular occasion.  Are you talking

     about the last time I was inside his house?

          Q.  Why don't you tell me on which particular

     occasion you recall him going underneath his house.

     Try to describe that.

          A.  It was after the conversation we had where

     he told me to go check out the Ashley Landing.

          Q.  And were you able to see what he was doing

     under the house?

          A.  Yes, what he did, he had -- he went under

     the house, and he got a fire restraint box.

          Q.  What is that now?

          A.  A fire restraint box.  It's about this big,

probably about this deep, and what it is is fireproof.

Q.    And where was that when you saw it?

A.    Well, he had it underneath -- he came from underneath his house with it.

Q.    And did he or did he not show it to you?

A.    Yes, he did.

Q.    Where did he show it to you?

A.    Right there, basically right by his screened-in porch.

Q.    And what, if anything, did you see?

A.    I saw a bunch of cash in 20-dollar denominations.  All of them was in 20s, 20-dollar bills.

Q.    Do you know of your own knowledge how much cash was in there?

A.    Looking at it, I would say around 30,000. I didn't count it, so I don't know how much it was.  I was just assuming around 30,000.

Q.    Did he tell you anything about it in terms of the quantity?

A.    No, I can't recall him telling me how much it was.  I don't recall him telling me how much there was in there.

Q.    And can you please show the jury how big the box was again?

WILFRED RIVERS - DIR. EX. BY MS. HENDRICKS        271

1    kept an additional 2,000 because he said he was going

2    to Georgia the next day and he said he was going to

3    splurge a little bit.

4         Q.   What else was discussed with Mr. Cooper at

5    that time, if anything?

6         A.   Nothing.

7         Q.   Did you ever count out the money that was

8    taken that night?

9         A.   No, I did not.

10        Q.   How do you know it was $30,000?

11        A.   Because Mr. Cooper told me it was 30,000.

12        Q.   I'm going to hand you what's been marked as

13   Government's Exhibit Number 5B for identification and

14   ask you if you recognize that.

15        A.   Yes, that's me in the remote.

16        Q.   And on what date is that?

17        A.   The date on it?

18        Q.   Is there a date depicted on that

     Government's exhibit?

          A.   Yes, it's 9-24-94.

          Q.   And is that the same remote that you've

     just been testifying about?

          A.   Yes, it is.

          Q.   And do you recall, is this the occasion

     that you and Mr. Cooper burglarized the Festival Centre


                A. WILLIAM ROBERTS, JR. & ASSOCIATES

WILFRED RIVERS - DIR. EX. BY MS. HENDRICKS    281

1    something.

2         Q.   And who else was there with you that night?

3         A.   Mr. Cooper.

4         Q.   And is that the night that money was taken?

5         A.   Yes, it was.

6         Q.   All right.  Now, you've previously

7    testified that after you left the Festival Centre

8    remote, you went to Mr. Cooper's house; is that

9    correct?

          A.   Correct.

          Q.   And you testified as to all the details as

     to that; is that correct?

          A.   Correct.

          Q.   And did you ultimately leave his house?

          A.   Correct.  I never actually went to his

     home.  I parked in front of his home on the side of the

     street.

          Q.   So you left that area?

          A.   Yes, I did.

          Q.   And where did you go?

          A.   I proceeded home.

          Q.   And did you have money with you?

          A.   Yes, I did.

          Q.   And how much money did you have?

          A.   $18,000.

          A. WILLIAM ROBERTS, JR. & ASSOCIATES

1      A.    This is the gun I used in the staged

2  robbery.

3      Q.    And how do you know it's the gun?

4      A.    I can't really see that well through this

5  plastic, but it's the same type of gun.

6      Q.    What type of gun is it?

7      A.    It's a 9 millimeter.

8      Q.    Was this your gun?

9      A.    Yeah, at the time it was.

10          MS. HENDRICKS:  Your Honor, I'd offer

11  Government's Exhibit Number 3.

12          THE COURT:  Without objection.

13  BY MS. HENDRICKS:

14      Q.    Where did you get that gun from,

15  Mr. Rivers?

16      A.    From a young man's apartment up in

17  Columbia.

18      Q.    Did you steal that gun?

19      A.    Yes, I did.

20      Q.    I'm going to hand you what's been marked

21  Government's Exhibit Numbers 2A and 2B.  I'd ask you if

22  you recognize Government's exhibits 2A and 2B for

23  identification.

24      A.    Yes, I do.

25      Q.    How do you recognize those?

1    Q.   Now, you testified that you stole the gun,

2    this Government's Exhibit Number 3?

3    A.   Yes, I did.

4    Q.   Did you originally tell the investigators

5    in this case that you had stolen that gun?

6    A.   From the beginning?

7    Q.   Yes, sir.

8    A.   No, I did not.

9    Q.   It was only later?

10    A.   Yes.

11    Q.   All right.  Okay, so you gather these

12    items, and what else if anything did you gather at that

13    point?

14    A.   A stocking mask and some duct tape, gray

15    duct tape.

16    Q.   And what did you do after that?

17    A.   I waited for my wife to come home because I

18    wanted to use her car.

19    Q.   And did she come home?

20    A.   Yes, probably maybe 15 minutes after I

21    arrived, she came.

22    Q.   Was Mr. Brian still with you?

23    A.   Yes, he was out in my backyard.

24    Q.   And what happened then?

25    A.   I went inside the house and told my wife I

weapon used on October 11th.  The question was, when
did you tell the FBI.  And the response you gave was
January of this year; is that correct?

     A.   Right.

     Q.   And I already asked you if you reviewed the
statements before coming to court today, and your
answer was yes?

     A.   Correct.

     Q.   May I approach, Your Honor?

     THE COURT:  Yes, sir.

BY MR. SAVAGE:

     Q.   Without referring to my notes or my yellow
markings, is this the statement that you have reviewed?

     A.   Yes.

     Q.   Is that the statement you're referring to
when you say you refreshed your memory or your
testimony that was given today?

     A.   Yes.

     Q.   Where in this statement do you indicate
that you stole the gun in Columbia, South Carolina, on
August 23rd, 1994?

     A.   It doesn't say when I got the gun.  It just
says that the gun belonged to me.

     Q.   It doesn't say you stole the gun.  That's
the point.  Did you tell them you stole the gun?

WILFRED RIVERS - CROSS-EX. BY MR. SAVAGE        353

1        A.    Yes, I did.

2        Q.    Is it in your report?

3        A.    No, it's not.

4        Q.    Is it in your statement?

5        A.    No, it's not.

6        Q.    So there are statements you gave the FBI

7    besides those?

8        A.    Yes, there are.

9        Q.    When did you give those?

10       A.    I don't remember when I gave all the

11   statements.

12       Q.    Was it before or after the statement you

13   have in front of you?

14       A.    It was before.  This was the last one that

15   I remember.

16       Q.    Would that have been on December 5th?

17       A.    I'm not sure.

18            MR. SAVAGE:  May I approach, Your Honor?

19            THE COURT:  Yes, sir.

20   BY MR. SAVAGE:

21       Q.    Mr. Rivers, is this the document that you

22   testified to in your testimony today that you prepared

23   by reviewing this document for your testimony today?

24       A.    Yes, I reviewed this document at the FBI

25   office.


                A. WILLIAM ROBERTS, JR. & ASSOCIATES

1          A.    If I'm not mistaken, probably about two

2    Fridays ago, last Friday or something like that.

3          Q.    That would be August or September of this

4    year?

5          A.    That would have been the end part of

6    August, something like that.

7          Q.    Friday, September 1st; is that correct?

8          A.    Somewhere in that area.

9          Q.    So we got that one.  You had also given a

10   written statement to the Mount Pleasant Police

11   Department back at Thanksgiving time on November 25th,

12   1994, consisting of eleven handwritten pages.  Is that

13   correct?

14         A.    That's correct.

15         Q.    Did you use this statement in preparing

16   your testimony that you gave for this jury yesterday

17   and today?

18         A.    Yes, I went over that statement.

19         Q.    You did go over this statement?

20         A.    Yes, I did.

21         Q.    And I'm assuming you went over the

22   statements that you gave to the FBI on November 15th of

23   1994 when you were working in an undercover capacity

24   trying to hook Mr. Cooper; isn't that correct?

25         A.    Yes, I did.

NATHAN WILLIAMS - DIR. EX. BY MS. HENDRICKS    456

1    A.    Yes.

2    Q.    How long did you continue on that route

3  with Mr. Cooper?

4    A.    Until approximately -- as a malfunction

5  team, we did that until October of '94.

6    Q.    And as a Pinkerton Security guard, did you

7  wear a firearm?

8    A.    Yes, I did.

9    Q.    And did Mr. Cooper wear a firearm?

10    A.    One was issued to him.

11    Q.    When you say one was issued to him, what do

12  you mean by that?

13    A.    Mr. Cooper had medical problems, which the

14  company, in agreement with him, stated that he was only

15  required to have his firearm in close proximity.  He

16  wasn't required to wear it.

17    Q.    Did you know of your own knowledge that he

18  had medical problems?

19    A.    We had spoken that he had had problems.

20    Q.    Did you ever have any concerns,

21  Mr. Williams, about being robbed?

22    A.    It had entered my mind just due to the

23  nature of the job.

24    Q.    Did you ever discuss that with Mr. Cooper?

25    A.    We would discuss what we should do in the

A. WILLIAM ROBERTS, JR. & ASSOCIATES

NATHAN WILLIAMS - DIR. EX. BY MS. HENDRICKS    468

1      A.   Yes, I did.

2      Q.   What happened when you were inside the van,

3 if anything?

4      A.   Once inside the van, at first I was placed

5 against the side of the van towards the door.  A few

6 minutes later, I was told to bring my arm up, and a

7 handcuff or some type of shackle was attempted to be

8 placed on my hands.

9      Q.   I'm going to hand you Government's Exhibits

10 Number 2A and 2B and ask you if you recognize these.

11      A.   They appear to be what was attempted to be

12 placed on myself and Mr. Cooper.

13      Q.   Were they placed on yourself and

14 Mr. Cooper?

15      A.   They had placed one on the wrist of

16 Mr. Cooper, but when they attempted to place it on me,

17 the chain or something of the cuffs broke.

18      Q.   What happened after that, Mr. Williams?

19      A.   A short time thereafter, it was decided, I

20 guess, that we would be taped up.  And during this

21 time, they were trying to have Mr. Cooper be quiet,

22 shouting expletives for him to be quiet.

23      Q.   What was he saying or doing at that point?

24      A.   He was in great distress and just telling

25 them not to hurt him, let them know that we were going

NATHAN WILLIAMS - DIR. EX. BY MS. HENDRICKS    469

1    to do whatever they wanted, and just not to hurt us.

2        Q.    Was he crying, to your knowledge?

3        A.    His voice appeared that he was crying.

4        Q.    So what happened after that?

5        A.    After that point, they taped Mr. Cooper's

6    mouth, and then at some point in it, we were both taped

7    by our hands, and I believe they also taped

8    Mr. Cooper's feet, and they taped mine as well -- well,

9    correction, they did not tape my feet.

10        Q.    All right.  And so what did the robbers do

11    at that point?

12        A.    After we were both secured with the tape,

13    we were told to not move for a period of time, I

14    believe it was 10 to 15 minutes, at which time

15    Mr. Cooper during this time was placed on top of me

16    from the position I was in the van.  The doors of the

17    van were closed, and they left.

18        Q.    During the time period before you came into

19    contact with Mr. Cooper in the van, were you ever able

20    to see the cassettes again?

21        A.    I don't recall seeing them between the time

22    the incident initiated and after the incident was over.

23        Q.    Did you see whether the robbers actually

24    received anything or took anything with them?

25        A.    After the incident was over, there were

A. WILLIAM ROBERTS, JR. & ASSOCIATES

NATHAN WILLIAMS - DIR. EX. BY MS. HENDRICKS    471

1    A.    No.

2    Q.    To the best of your knowledge, had you ever

3 seen either one of them before?

4    A.    No.

5    Q.    And what happened after the individual

6 kicked you in the leg and left?

7    A.    A short time after that, I started to free

8 my hands and mouth to attempt to calm down Mr. Cooper,

9 free him, and then make the appropriate notifications.

10   Q.    And did you do so?

11   A.    Yes, I did.

12   Q.    And who did you notify?

13   A.    Once we freed ourselves from the van, I

14 called 911, and Mr. Cooper activated the alarm system.

15   Q.    And what happened after that?

16   A.    A short period later, Mount Pleasant police

17 arrived.

18   Q.    Did anyone else arrive?

19   A.    Several police units.

20   Q.    Did EMS respond?

21   A.    It was not until possibly maybe 30, 45

22 minutes later, I believe.  EMS was called to extricate

23 Mr. Cooper from the handcuffs.

24   Q.    Were either one of you injured?

25   A.    Not to my knowledge.


A. WILLIAM ROBERTS, JR. & ASSOCIATES

CALVIN TUCKER - DIR. EX. BY MS. HENDRICKS       538

MS. HENDRICKS:  Thank you, Your Honor.

BY MS. HENDRICKS:

Q.   And when was that work done?

A.   About July of '94, somewhere in there.

Q.   And were you paid by Mr. Cooper for that work?

A.   Yes, we were.

Q.   And how were you paid?

A.   Cash and checks.

Q.   Approximately how much were you paid by Mr. Cooper, if you recall?

A.   On the first project we made an agreement, got the guys to help out, $1,200 for labor.

Q.   And approximately how long did you perform that particular project for Mr. Cooper?

A.   Over about two months, two-month period.

Q.   So you began those projects in July, you say?

A.   Right.

Q.   And you say it was two months after that --

A.   When we got finished, yes, ma'am.

Q.   Did you ever have any occasions to ride with Mr. Cooper in his Pinkerton van?

A.   Yes, ma'am.

Q.   And when was that?

A. WILLIAM ROBERTS, JR. & ASSOCIATES

CALVIN TUCKER - CROSS-EX. BY MR. SAVAGE        543

1    from the job sites, do you know what those materials

2    were used for?

3                MR. SAVAGE:  Asked and answered.

4                MS. HENDRICKS:  I don't believe I asked

5    that, Your Honor.

6                THE COURT:  I don't believe she did.  I'll

7    let him answer it.

8                THE WITNESS:  Repeat the question, ma'am.

9    BY MS. HENDRICKS:

10        Q.   The materials that you and Mr. Cooper took

11   from the job sites, do you recall what those materials

12   were used for?

13        A.   Yeah, the addition on the house, breezeway,

14   garage, screened-in porch.

15        Q.   You said you were paid in checks on

16   occasion; is that correct?

17                MR. SAVAGE:  Asked and answered again.

18   He's testified to that.

19                THE COURT:  I think he's already mentioned

20   that he was paid by check and cash.

21                MS. HENDRICKS:  Yes, sir, Your Honor.

22   That's all the questions I have.  Thank you.

23                THE COURT:  Mr. Savage?

24                     CROSS-EXAMINATION

25   BY MR. SAVAGE:

A. WILLIAM ROBERTS, JR. & ASSOCIATES

CALVIN TUCKER - CROSS-EX. BY MR. SAVAGE          546

1    Q.    -- until this morning.

2    A.    Until this morning.

3    Q.    Now, Mr. Tucker, did I interview you in

4    this courtroom yesterday?

5    A.    Yes, sir.

6    Q.    Did you tell me the truth at that time?

7    A.    Yes, I did.

8    Q.    Did you tell the same truth to the

9    Government yesterday?

10   A.    Yes, sir.

11   Q.    Do you want this jury to know the truth

12   about what you did in the summer of 1994?

13   A.    Yes, sir.

14   Q.    Now, you knew Mr. Cooper because you were

15   working for the construction company that was building

16   his home; true?

17   A.    True.

18   Q.    You were paid by him in checks and cash,

19   true?

20   A.    Yes, sir.

21   Q.    The cash that you were paid in was in

22   varied denominations, not brand new money.  It was paid

23   in just plain, old, everyday cash.  Is that true?

24   A.    To my knowledge, yes, sir.

25   Q.    Now, you were interviewed by the FBI back

A. WILLIAM ROBERTS, JR. & ASSOCIATES

CLYDE LUNSFORD - EX. BY MS. WILSON

573

1      Q.   And on that same day, July 2nd, can you

2   tell when that alarm was first deactivated?

3      A.   Yes, it was deactivated at 9:26 in the

4   morning.

5      Q.   How many hours would you say that that

6   alarm was off?

7      A.   Over eight hours.

8      Q.   Now I'm going to show you Government's

9   Exhibit Number 41A and show this to the jury.  Now, is

10   this a similar report that you prepared?

11      A.   Yes, it contains the same information but

12   different dates.

13      Q.   And the other statement, Government's

14   exhibit 41, was sent to Agent Little?

15      A.   Yes.

16      Q.   And this actually was prepared for

17   NationsBank?

18      A.   Yes.

19      Q.   Now, on this report that you prepared,

20   there's something listed all the way down, P code 88.

21   Can you explain to the jury what P code 88 means?

22      A.   On our reports, when I run an alarm report

23   such as this, I don't get the actual task code that was

24   entered, all the digits.  But I do get the first two

25   digits of the passcode entered, which is unique.  It's

CLYDE LUNSFORD - EX. BY MS. WILSON          576

1      A.   Yes.

2      Q.   Now, step down here again.   On State's

3  exhibit 41A that you prepared, on September the 24th,

4  do you notice anything unusual?

5      A.   Yes, the alarm was accessed outside of the

6  service hours.

7      Q.   And what time was the alarm accessed?

8      A.   It was accessed at 007, which was seven

9  minutes after midnight.

10      Q.   And was it later set?

       A.   It was set at 3:16 in the morning.   That's

3 a.m., and it was set from that location.

       Q.   And what passcode was used to deactivate

and reactivate the alarm?

       A.   Passcode 88, which is normally assigned to

Pinkerton.

       Q.   Now, Mr. Lunsford, with regards to the

events of 9-24 and 7-2, did these alarms come to your

attention then?   Like on the actual date, on July 2nd,

did you notice this and make the report?

       A.   July 2nd, that was within the normal hours.

Because it was set from my console, one of my operators

noticed that the alarm was not set and had not been set

for some time and set it from our console on the 2nd of

July.


                A. WILLIAM ROBERTS, JR. & ASSOCIATES

SUSAN B. HORT - CROSS-EX. BY MR. SAVAGE          611

1        Q.   Now, as to the accuracy of the report --

2   you introduced Government's 38.  Do you have that

3   before you?

4              THE COURT:  She has it.

5   BY MR. SAVAGE:

6        Q.   Government's 38 is a letter by Ms. Gentry

7   dated July 22nd; is that correct?

8        A.   Yes.

9        Q.   And that refers to correspondence of an

0   earlier date; is that correct?

1        A.   Yes, July 7th.

2        Q.   And Government's 38, which is dated July

3   22nd, is reference to a loss at the Festival Centre of

4   $9,125; is that correct?

5        A.   Yes.

6        Q.   And you have testified that the loss took

7   place between July 1st and July 7th; is that correct?

8        A.   Yes.

9        Q.   And it was verified on July 7th how much

0   money was missing; isn't that correct?

1        A.   Yes.

2        Q.   How much money was missing on July 7th?

3        A.   The machine was short $9,125.

4        Q.   Have you read the letter dated July 7th

5   that's referred to in Government's 38?

          A. WILLIAM ROBERTS, JR. & ASSOCIATES

1          MR. SAVAGE:  May I approach, Your Honor?

2          THE COURT:  You may.

3          THE WITNESS:  Yes.

4    BY MR. SAVAGE:

5          Q.  Are you familiar with that correspondence?

6    I'm only asking you some preliminary questions.  The

7    Government's 38 which you introduced which you say you

8    had care, custody, and control of in your business

9    records refers to a letter of July 7th.  You now have

10   that letter which is referencing Government's 38.  Yes

11   or no?

12         MS. WILSON:  Your Honor, may I look at the

13   letter he's referring to?

14         THE COURT:  If you haven't seen it.

15   BY MR. SAVAGE:

16         Q.  Now, ma'am, I want to go back.  The basis

17   for your introducing Government's 38 was your testimony

18   that you kept care, custody, and control during your

19   regular course of business at NationsBank those

20   records.

21         A.  Okay.

22         Q.  Government 38.  Isn't the July 7th letter

23   that you now hold in your hand what's referenced in the

24   July 22nd letter?

25         A.  It appears to be because it's the same

A. WILLIAM ROBERTS, JR. & ASSOCIATES

SUSAN B. HURT - CROSS-EX. BY MR. SAVAGE          613

1    identical machine.  But they're saying that an audit

2    was performed on 7-6, and it was $7,200 short.  This

3    references an audit of July 7th.  So in other words,

4    they counted the machine on July 6th, provided Mary

5    with a shortage of $7,200.  The next day it was counted

6    again, and they came up with a different amount of

7    9,125.  These cash counts were provided by Pinkerton,

8    not NationsBank.

9         Q.   Would it be your testimony then, based on

10   those two documents, there were multiple losses at that

11   machine between July 1st and July 7th?

12        A.   That's correct.

13        Q.   Now, are you familiar with the security

14   system and how they control in Atlanta --

15        A.   Very vague.

16        Q.   Are you familiar with those records, they

17   can tell who was in and out and what times and all?

18        A.   Yes, I am.

19        Q.   Are you familiar with whether or not there

20   were multiple penetrations of the alarm system between

21   July 1st and July 7th?

22        A.   There was only one generic code, code 88,

23   that was used for Pinkerton.  So 40 Pinkerton employees

24   in Charleston could have gone into that machine and

25   used that one code.


A. WILLIAM ROBERTS, JR. & ASSOCIATES

R. GEOFFREY LEVY - DIR. EX. BY MS. HENDRICKS    801

1        A.   I brought my file, yes, ma'am.

2        Q.   And is that the official Court file?

3        A.   No, this is my file as a Chapter 13

4    trustee.  It is pretty close to identical to what the

5    Court would have.  Virtually anything that is filed in

6    the Court then comes to me.

7        Q.   I'm going to hand you what's been marked as

8    Government's Exhibit Number 100 for identification, and

9    I'd ask you if you recognize that:

10        A.   Yes, ma'am.  This is Carl B. Cooper and

11    Dorothy A. Cooper's Chapter 13 plan.  The plan was

12    confirmed by the Bankruptcy Court, the plan dated July

13    28, 1994.

14        Q.   And if you could just please skim through

15    briefly the pages in that document and tell us whether

16    or not all of the pages are a part of the records of

17    his plan.

18        A.   Sure.  Yes, ma'am.

19             MS. HENDRICKS:  Okay.  Your Honor, I'd

20    offer Government's Exhibit Number 100 at this time.

21             MR. SAVAGE:  Without objection.

22             THE COURT:  It's admitted.

23    BY MS. HENDRICKS:

24        Q.   Now, Mr. Levy, I'd ask you to look at your

25    records that you've got with you.  And by looking at

A. WILLIAM ROBERTS, JR. & ASSOCIATES

R. GEOFFREY LEVY - DIR. EX. BY MS. HENDRICKS    802

1    your records, could you tell us when this case was
2    filed?

3          A.  Yes, ma'am, I can.  It was filed on May
4    19th, 1994.

5          Q.  And what is the exact title of the case in
6    terms of the case number?

7          A.  The case number is 94-72416.

8          Q.  And what is the current status of that
9    case, Mr. Levy?

10          A.  At the current time, it is an ongoing case.
11    It's a 571 plan.  Mr. Cooper is current in his plan up
12    to September.  I believe his September payment is due
13    at this point.

14          Q.  What exactly does the plan involve in this
15    case, Mr. Levy?

16          A.  Mr. Cooper, I think, did what you typically
17    see in these cases.  This is a 5 percent plan,
18    nonsecured creditors.  He has retained his home, which
19    is very common in these situations.  The plan calls for
20    a repayment of the arrearage on his home mortgage.  He
21    apparently was behind on his mortgage at the time he
22    filed, which is also common.  He has secured debt to
23    Sears and Badcock.  Those would be home furnishing type
24    of obligations, I would think, and also Norwest
25    Financial and Rhodes Furniture, and also to Montgomery

1          MR. SAVAGE:  Thank you, sir.

2          MS. HENDRICKS:  I have no further questions

3     for this witness, Your Honor.

4          THE COURT:  May he be excused?

5          MS. HENDRICKS:  Yes, sir, Your Honor.

6          MR. SAVAGE:  Without objection.

7          THE COURT:  You may be excused.

8          THE WITNESS:  Thank you.

9          MS. WILSON:  Your Honor, the Government

10    calls Agent David Espie.  Your Honor, we're going to

11    have to take this witness out of order because of our

12    time schedule.

13         THE COURT:  We hear them as you call them.

14    We don't care what the order is.

15              DAVID ALAN ESPIE, III,

16    being first duly sworn, testified as follows.

17         MR. SAVAGE:  Your Honor, I think we have a

18    matter we need to bring up.

19         THE COURT:  You may go to the jury room for

20    a few minutes, and we'll see what this matter is.  If I

21    see it's going to be lengthy, I'll bring you back in

22    and let you go home.

23              (The jury recessed.)

24         MR. SAVAGE:  Your Honor, I just took a

25    quick look at Mr. Espie's package, and it's all about

A. WILLIAM ROBERTS, JR. & ASSOCIATES

1    polygraph exams.

2                THE COURT:  Say again.

3                MR. SAVAGE:  This is the polygraph

4    examiner; is that correct?

5                THE WITNESS:  We conducted an interview.

6                THE COURT:  I don't know.

7                MR. SAVAGE:  If it's an interview

8    associated with a polygraph --

9                THE WITNESS:  Polygraph is not going to be

10   mentioned, Your Honor.

11               MR. SAVAGE:  And that's the purpose that

12   Mr. Cooper went to cooperate in taking the polygraph

13   examination.  I think --

14               MS. WILSON:  Your Honor, there will be no

15   testimony about the polygraph, no testimony about why

16   the Defendant was present with Mr. Espie or Agent

17   Espie.  The only testimony will be that this was an

18   agent called in to interview the Defendant, and after

19   the Defendant was read his rights, that he agreed to

20   give a statement, and we'll get into the specifics of

21   his statement only.  No mention of polygraph

22   whatsoever.

23               THE COURT:  I think she can do that,

24   Mr. Savage.

25               MR. SAVAGE:  Your Honor, I object on the

A. WILLIAM ROBERTS, JR. & ASSOCIATES

DAVID ALAN ESPIE III - DIR. EX. BY MS. WILSON    834

1    contact his attorney or have him present during the

2    interview, and he chose to waive that right.

3        Q.   So did he have an attorney present?

4        A.   No, he did not.

5        Q.   Was there anyone else present with you and

6    the Defendant, Mr. Cooper?

7        A.   For the first three hours or so, no.  Later

8    on, Agent Little of the FBI did join me in the

9    interview.

10       Q.   Now, when you were speaking with

11   Mr. Cooper, did he seem to understand everything that

12   you were saying?

13       A.   Yes.

14       Q.   And did you have any concern about his

15   being intoxicated or anything impairing his mental

16   faculties?

17       A.   No, he seemed to be both physically and

18   emotionally stable.

19       Q.   And do you see the man that you

20   interviewed, Mr. Carl Cooper, here today?

21       A.   Yes, he's sitting over at the defense table

22   to the far right.

23       Q.   In the black jacket?

24       A.   Yes.

25           MS. WILSON:  Your Honor, let the record

DAVID ALAN ESPIE III - CROSS-EX. BY MR. SAVAGE   856

1          Q.   But the word you gave was initially.   When

2     I heard you say that, I thought perhaps maybe he

3     changed his story during the course of the interview?

4          A.   No, sir.

5          Q.   He was consistent in all aspects of his

6     interview regarding the armed robbery which he suffered

7     on October 11th, 1994?

8          A.   He provided me information known in my

9     report.

10         Q.   And of course at the end of the interview,

11    we started getting into things that are not associated

12    with this case, which were not related to your

13    interview about his Florida dog track winnings or

14    losses, his Georgia lottery, and his playing the

15    numbers, which you have told this jury was illegal in

16    the City of Charleston, correct?

17         A.   I disagree that that's irrelevant.

18         Q.   That's not what he's on trial for, is it?

19              THE COURT:   Just ask him the questions,

20    Mr. Savage.

21    BY MR. SAVAGE:

22         Q.   Is he charged with gambling in this case?

23              THE WITNESS:   Can I explain my answer, Your

24    Honor?

25              THE COURT:   I don't know because we don't

WILLIAM ROLAND VENO - DIR. EX. BY MS. HENDRICKS  860

1          A.   Yes, it is.

2               MS. HENDRICKS:  And I'd offer Government's

3     Exhibit Number 103 at this time.

4               MR. SAVAGE:  Without objection.

5               THE COURT:  Admitted.

6     BY MS. HENDRICKS:

7          Q.   Could you please describe for the jury

8     what's contained in Government's exhibit 103?

9          A.   It is Mr. Cooper's invoice receipt for the

10    purchase of the URD system that he bought, and it was

11    installed on October 4th, 1994.

12         Q.   Okay.  And does it also indicate the cost

13    of that system?

14         A.   Yes, it does.

15         Q.   And what is that?

16         A.   2699 plus tax was 2834.75.

17         Q.   And does it indicate how that system was

18    paid?

19         A.   Paid in full.  It was paid in cash.

20         Q.   Did you install the system?

21         A.   Yes, I did.

22         Q.   And did Mr. Cooper pay you himself?

23         A.   Yes, he did.

24         Q.   And when you say it was paid in cash, can

25    you describe the cash?

WILLIAM ROLAND VENO - DIR. EX. BY MS. HENDRICKS 861

1          A.    Yeah, lots of 20s.

2          Q.    And was there anything else about the cash

3     that you noticed?

4          A.    I mean, it was basically -- if you had gone

5     to the bank and got cash out, it was fairly new money.

6          Q.    And did he pay you all in one time?

7          A.    Yes, he did.

8          Q.    Okay.  And did you say that you yourself

9     went and installed the system at Mr. Cooper's house?

10         A.    Yes, ma'am, me and one of my associates.

11         Q.    And did you have an opportunity to go into

12    his home at that time?

13         A.    Yeah, when we did the final install, we

14    did.

15         Q.    Could you please describe for the jury what

16    the interior of Mr. Cooper's home looked like?

17         A.    I was only in one room, the room where I

18    put the system at.

19         Q.    What room was that?

20         A.    I would call it a family room.

21         Q.    Could you please describe for the jury what

22    that room looked like in terms of the things that were

23    in it and so forth?

24         A.    It had a television, stereo system, little

25    wet bar, pictures on the wall.  It was a well done -- I

1      A.   Uh-huh.

2      Q.   And it was well-kept, neat?

3      A.   Yes.

4      Q.   Sort of like a military retiree would keep?

5      A.   Yes, sir.

6      Q.   And things up on the wall, whatever you --

7      A.   Military -- pictures of him in his uniform.

8      Q.   And there were people outside working

9   concrete?

10      A.   Um-hum.

11      Q.   You remember the concrete guy?

12      A.   Um-hum.

13      Q.   You don't know his name?

14      A.   No, huh-uh.  The reason I remember, because

15   we had to drive around the driveway to get into the

16   backyard because it was fresh poured.

17      Q.   Now, I want to show you something you

18   probably don't know, and that's Government's Exhibit

19   Number 79.  This is something that happened before you

20   left Ohio.  But you're familiar with checks and banking

21   procedures?

22      A.   Um-hum.

23      Q.   I want you to look at this page, and do you

24   recognize that as a check?  Is it a check for cash

25   dated October 4, 1994?

A. WILLIAM ROBERTS, JR. & ASSOCIATES

```
 1              A.    Um-hum.

 2              Q.    Written by Carl Cooper?

 3              A.    Um-hum.

 4              Q.    For cash?

 5              A.    Um-hum.

 6              Q.    In the amount of $1,500?

 7              A.    Um-hum.

 8              Q.    And that's the day that Mr. Cooper paid you

 9    cash for the satellite?

10              A.    Um-hum.

11              Q.    And you say that the money looked like it

12    came from a bank?

13              A.    Well, I didn't think anything unusual of

14    it.  A lot of times I go to a bank and cash a check and

15    they give me small bills because that's all they've

16    got.

17              MR. SAVAGE:  Thank you, Mr. Veno.

18              MS. HENDRICKS:  I have no further

19    questions.

20              THE COURT:  May he be excused?

21              MS. HENDRICKS:  Yes, sir.

22              MR. SAVAGE:  Without objections.

23              THE COURT:  You may be excused.  Have a

24    safe trip home.  The jury and I are at a stopping

25    place.  I don't know about y'all.
```

A. WILLIAM ROBERTS, JR. & ASSOCIATES

TONY JEFFERSON - CROSS-EX. BY MR. SAVAGE       1050

1      A.   The trap door you call it, 28 by 32.

2  That's a standard size.

3      Q.   Have you ever been under the house after

4  you built it?

5      A.   No.

6      Q.   Do you know whether there's moisture

7  underneath the house?

8      A.   I might have been about ten foot under the

9  house.

10      Q.   Now, Mr. Jefferson, you say that you had

11  done various weekend-type projects for Mr. Cooper?

12      A.   One.

13      Q.   One?

14      A.   One.

15      Q.   And that you had been paid by check for

16  some of the work that you did; is that correct?

17      A.   Right.

18      Q.   And I believe that you testified that it

19  was on two occasions; is that correct?

20      A.   To my knowledge, yeah.

21      Q.   And that you were paid in cash on other

22  occasions?

23      A.   Right.

24      Q.   And one of the times you were paid in cash,

25  the money stuck together?

A. WILLIAM ROBERTS, JR. & ASSOCIATES

TONY JEFFERSON - CROSS-EX. BY MR. SAVAGE

1    A.    Right.

2    Q.    And that time when you were paid in cash,

3    the money that you were paid was somewhere in the

4    neighborhood of 250 to $350; is that correct?

5    A.    Yeah, most of my job was in the

6    neighborhood of 275, so it would have been in that

7    price range.

8    Q.    It was less than --

9    A.    Less than 275.

10    Q.    Less than 275.  And that's the money --

11    A.    That's my labor money.  Doesn't count the

12    material or concrete, but I didn't have nothing to do

13    with that.

14    Q.    The other times you were paid in cash, you

15    were paid in cash that you don't -- that time you

16    remember the money stuck together and that you overpaid

17    your helper, but the other occasions you were paid in

18    cash, the cash was -- I don't want to say used cash,

19    but not brand new cash, sticky cash?  Is that correct?

20    A.    Yeah.  Let me make sure I hear you right.

21    Q.    The denominations that you were paid in --

22    let's talk about that first -- were 50 and $100 bills?

23    A.    Yeah.

24    Q.    Were there other $10 bills and $5 bills and

25    $20 bills mixed in that as well?

1    Judge.   The page 41 testimony is taken in context with

2    the page 37 testimony. There's no link -- do you

3    remember the lady testified they lost $207,000 at

4    NationsBank, including the $9,000 lost at Ashley

5    Landing in the summer of 1994, which Your Honor kept

6    out.

7           Now, there was more than one $9,000 loss.

8    And the only loss that is in evidence is the Ashley

9    Crossing loss from the July weekend.   The bank has

10   testified that it happened over a consecutive seven-day

11   period.   Of course Saturday would be one of those days.

12   So would Thursday, Tuesday, Monday, Wednesday, or

13   Friday. There's no link at all in that statement to

14   the specific act that is charged to the overt act in

15   the conspiracy, and that is the $9,000 loss at Ashley

16   Crossing. There's no link whatsoever other than it's a

17   like amount, a like amount like other like amounts or

18   losses to NationsBank that summer which he's not

19   charged with and is not linked with any other count.

20          I'm getting off track here, but I want to

21   be responsive to Ms. Hendricks and your inquiry.   I'm

22   back at the close of the Government's case. In

23   furtherance of my motion of severance, I would proffer

24   that Sergeant Trappier would have testified today that

25   he loaned Mr. Cooper $3,600 -- $3,100 in May of 1994.


A. WILLIAM ROBERTS, JR. & ASSOCIATES

1    stolen proceeds from an ATM.  There is no proof of that

2    at all.

3              THE COURT:  How about that, Ms. Hendricks?

4              MS. HENDRICKS:  Beg the Court's indulgence

5    for just one second.  Your Honor, the witness who

6    testified about the satellite system testified that it

7    was paid for in brand new sticky cash, mostly all 20s.

8              MR. SAVAGE:  I challenge that, Your Honor.

9    I don't believe he did.  I believe there was a check

10   introduced for cash the day of the purchase of that for

11   $1,500.

12             MS. HENDRICKS:  It was a cashier's check, I

     believe, Your Honor, that Mr. Cooper had cashed

     previously, if I'm not mistaken.  We may need to check

     the record.

               THE COURT:  A cashier's check?

               MR. SAVAGE:  First of all, the date's wrong

     on here.  I just realized it.  The date of October 3rd

     is wrong.  That's the date taken from the FBI's 302.

     It was purchased on the 4th of October and delivered on

     the 5th.  It was paid for on the 4th.  There's a check

     in evidence that they introduced for cash in the amount

     of $1,500, counter check.

               THE COURT:  Are you saying the Indictment

     has a bad date in it?


                A. WILLIAM ROBERTS, JR. & ASSOCIATES

1    sticky cash in denominations of 20s, and we believe

2    that's sufficient evidence to support that.  The theft

3    occurred on September the 24th from the ATM of $40,000,

4    and here it is October the 3rd, he's purchasing a

5    satellite system with brand new cash.

6             THE COURT:  I deny your motion.

7             MR. SAVAGE:  May I be heard further, Judge?

8             THE COURT:  Yes, sir.

9             MR. SAVAGE:  Judge, if I could hand up to

0    the Court Government's exhibit 103, which is the

1    document that indicates -- and the testimony conforms

2    with that -- the payment was made on October 4th and

3    delivery was on the 5th, not on October the 3rd.  And

4    I'll also hand up to the Court Government's exhibit 79.

5    Again, this is Government's exhibit 79, and I direct

6    your attention to a check that was cashed on October

7    4th with Mr. Cooper's driver's license in the amount of

     $1,500.

              And I would further advise the Court that

     the testimony of Mr. Veno did not say anything about

     sticky $20 bills, but said that he was paid in cash,

     said that he didn't think anything was unusual about

     that.  He goes to the bank, and they give him small

     bills all the time.  Now, he did say he was paid in

     cash, and he did say there were lots of 20s, but he

                A. WILLIAM ROBERTS, JR. & ASSOCIATES

1   never mentioned anything about sticky money, and I

2   would suggest that the Government's date of October

3   3rd, which is reflected in the FBI 302 report, is

4   incorrect, and perhaps the reason it was incorrect is

5   because they knew about the check on the 4th, which is

6   the day it was purchased, and the testimony of the

7   witness was --

8           MS. HENDRICKS:  Objection, Your Honor, to

9   some characterization of a 302, that it was

.0  intentionally wrong.

.1          MR. SAVAGE:  Do you have the 302?

.2          THE COURT:  I don't know what you mean by

3   that.  But he's saying that's the reason that date

4   appears in this Indictment is because somebody copied

5   it out of the 302.  I think that was his point.

6           MS. HENDRICKS:  Yes, sir, Your Honor.  It

7   doesn't say that -- this particular paragraph doesn't

8   say that Mr. Cooper entirely utilized proceeds stolen

9   from an ATM.  It says utilized proceeds stolen from an

)   ATM.  The witness did testify it was paid for in cash,

¦   at least a substantial portion of it -- all of it.

¦           MR. SAVAGE:  Your Honor, I handed up the

    Government's 302 report that does reflect the misdate

    on that of October 3rd.  And I would suggest that his

    characterization is highly speculative.  It is not

1   out.  It's pretty obvious that I thought that he

2   probably was an informant.  But I don't know that I've

3   reviewed the difference between an informant and --

4              MR. SAVAGE:  Let me tell you how else he

5   was an informant, perhaps not in such a favorable

6   light.  He was an informant as to Carlos Anderson.  He

7   was an informant as to Jay Brown where he framed those

8   people.  I think that's what he agreed to, that he

9   tried to frame those people.  So he acted as an

10  informant in gathering information, inculpatory

11  information, as an FBI agent.  And since that time,

12  he's acted for the FBI in giving culpatory information

13  to Duane Bryant.  It's not just Mr. Cooper.  There were

14  three other gentlemen that he tried to hook.

15             THE COURT:  Anything further on that,

16  Ms. Hendricks?  What makes you think he wasn't an

17  informant?

18             MS. HENDRICKS:  Your Honor, I guess I'm

19  used to thinking of informants in terms of drug cases,

20  signing them up and going out and making cases and

21  being paid for it.  It's just the definition seems to

22  fit, but the characterization, I guess, is stronger

23  than the Government would like.  And so I would object

24  to him being called an informant, but that would be up

25  to the Court to determine.


                A. WILLIAM ROBERTS, JR. & ASSOCIATES



It's pretty obvious that I thought that he was an informant. But I don't know that I've difference between an informant and -- Let me tell you how else he . . favorable

1    out. It's pretty obvious that I thought that he

2    probably was an informant. But I don't know that I've

3    reviewed the difference between an informant and --

4           MR. SAVAGE: Let me tell you how else he

5    was an informant, perhaps not in such a favorable

6    light. He was an informant as to Carlos Anderson. He

7    was an informant as to Jay Brown where he framed those

8    people. I think that's what he agreed to, that he

9    tried to frame those people. So he acted as an

10    informant in gathering information, inculpatory

11    information, as an FBI agent. And since that time,

12    he's acted for the FBI in giving culpatory information

13    to Duane Bryant. It's not just Mr. Cooper. There were

14    three other gentlemen that he tried to hook.

15           THE COURT: Anything further on that,

16    Ms. Hendricks? What makes you think he wasn't an

17    informant?

18           MS. HENDRICKS: Your Honor, I guess I'm

19    used to thinking of informants in terms of drug cases,

20    signing them up and going out and making cases and

21    being paid for it. It's just the definition seems to

22    fit, but the characterization, I guess, is stronger

23    than the Government would like. And so I would object

24    to him being called an informant, but that would be up

25    to the Court to determine.

A. WILLIAM ROBERTS, JR. & ASSOCIATES